**Sever VADUVA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 97–1931.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1997.

Decided Dec. 15, 1997.

Robert A. Perkins (argued), Perkins & Associates, Chicago, IL, for Petitioner.

Janes Reno, U.S. Atty., Office of the U.S. Atty. General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Philemina Jones, Kristal A. Marlow, Michelle Gluck, Loreto S. Geisse (argued), Dept. of Justice Civil Div., Immigration Litigation, Washington, DC, for Respondent.

Before CUMMINGS, MANION and EVANS, Circuit Judges.

MANION, Circuit Judge.

■ Sever Vaduva was 25 years old when he left Romania in August 1993 and entered the United States on a crewman's visa. He later applied for asylum. Although the Board of Immigration Appeals denied asylum, he has a leg up on most petitioners seeking review because the Board found that on at least one occasion Vaduva had experienced persecution while in Romania. Under the law, that finding created a rebuttable presumption in favor of granting Vaduva asylum. See Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991) ("Past persecution creates a presumption in favor of granting asylum, but the presumption is rebuttable; among other factors admissible in rebuttal is a demonstration that ... the alien is not in danger of being persecuted again."). The Board found the presumption rebutted by the INS' documentary evidence demonstrating that Vaduva could no longer reasonably fear persecution in his homeland. Vaduva appeals the Board's denial of asylum; we affirm.

■ We will affirm the Board's decision denying asylum if it is supported by "reasonable, substantial, and probative evidence." Sivaainkaran v. INS, 972 F.2d 161, 163 (7th Cir.1992). There is no dispute that the Board reasonably concluded Vaduva (a member of the pro-democracy National Liberal Party) suffered at least one instance of political persecution while residing in Romania; on Christmas Eve in 1992 he was beaten up (he was punched, his face bruised, and his finger broken) by strangers who told him to stay away from the pro-democratic forces in the country. The Christmas Eve incident by far was the most serious one experienced by Vaduva, and it is noteworthy because it occurred several years after the 1989 overthrow of Nicolae Ceausescu, Romania's brutal Communist dictator. (Vaduva apparently was beaten on one other occasion, in 1987, when Romanian police forced him to do push-ups for several minutes while hitting him on the soles of his feet. There were other instances of harassing telephone calls, warnings, and at least one interrogation at the hands of Romanian authorities-these occurred over a period of years, some during and some after the Ceausescu regime.) While the Christmas Eve incident makes Vaduva presumptively eligible for asylum, it does not mean that he is entitled to it. Vaduva exaggerates the statute's terms in claiming otherwise, see Skalak, 944 F.2d at 365 ("[e]ligibility is not entitlement"), and his is not the rare case where past persecution is so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution. In those cases, asylum must be granted as a matter of law (immediately returning German Jews to Germany after the destruction of the Nazi regime is one example), but "in lesser cases of past persecution and perhaps even in the most serious cases if the persecuted group has become the ruling group, deportation may not be inhumane." Id.

Having demonstrated his eligibility for asylum by proving past persecution, the question becomes whether the Board erred in denying asylum on the ground that Vaduva reasonably could not fear persecution if he returned to Romania. As it does in many cases, the INS asked the State Department for its opinion as to the likelihood of persecution if asylum is denied. The State Department issued a letter doubting that Vaduva had ever been persecuted, and further dismissing any claim that he could fear persecution upon his return to his homeland. "Even if we were to accept [that he was beaten in 1992], there does not, in our view, appear to be a basis on which he can plausibly maintain that he would face new mistreatment pertinent to our asylum legislation on his return to his own country." The Department referenced its June 1995 profile on Romania, in which it acknowledged that Romania had been one of the most oppressive Communist regimes under the dictatorship of Ceausescu. But the report noted that the Ceausescu regime was overthrown in 1989, and since then Romania has had two democratic national elections (in 1990 and 1992) in which the country elected Ion Iliescu president. (There has since been a third; in 1996, Iliescu was defeated.) The report concluded that "the democratic process and protection of individual rights have taken hold" since the

1992 elections; in fact, "country conditions have so altered in the six years since the overthrow of Communism as to remove any presumption that past mistreatment under Ceausescu or in the chaotic first year after his death will lead to future mistreatment."

■ The Board relied heavily on the State Department's report; it is the only documentary evidence cited to rebut Vaduva's presumption of persecution. It was reasonable for the Board to place weight on a report issued by an expert in the field, which the State Department is, even if the Department may have a "tendency to downplay human-rights violations by governments with which the United States wants to have friendly relations." *Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir.1997). But Vaduva claims the report is wrong to trumpet the 1992 reelection of Iliescu as marking a profound shift toward reform in Romania. After all, he was persecuted in December 1992, two months *after* the election. Chronologically, Vaduva is correct, but the Department's report does not contend that reform in Romania occurred overnight. Rather, the report details a gradual, cumulative improvement in the country between the 1992 elections and June 1995 (the month the report was issued).

■ The State Department's report does not necessarily mean that Vaduva loses, but he "had better be able to point to a highly credible independent source of expert knowledge if he wants to contradict the ... Department's evaluation of the likelihood of his being persecuted if he is forced to return home, an evaluation to which courts inevitably give considerable weight." *Id.* Vaduva amassed an impressive record before the Board (this is not a case of "self-serving and insufficiently grounded testimony," *id.*). The problem is that the vast majority of Vaduva's evidence predates the State Department's June 1995 report on Romania. For example, Vaduva offered a 1993 letter from a former U.S. Ambassador to Romania decrying conditions there. Not only is the letter dated two years prior to the State Department's report, it even predates Vaduva's departure from the country. So it is hardly probative of *present* conditions in Romania, and therefore of the risk Vaduva presently faces if he were to

return to his native country. The most probative evidence in the record (supporting Vaduva) comes from a 1995 Amnesty International Report (dated one month before the State Department's report); the Amnesty report contains anecdotal evidence of human rights violations and concludes that reform in Romania has not been entirely successful.

If it is reasonable to suspect the State Department has a tendency to soft-pedal human rights violations, *Gramatikov*, 128 F.3d at 620, it may be just as reasonable to suspect that Amnesty International exaggerates them so they will not go without notice. We need not determine if either suspicion is correct in this case because the purposes of the two reports are not the same. Only the State Department's report is tailored to the exact question at issue here (whether Vaduva reasonably should fear *persecution* if he returned to Romania), and that report concludes he should not. The Amnesty report is descriptive (of human rights violations), not predictive. Indeed, the two reports are not exactly at odds in the first place; Amnesty's anecdotal evidence is entirely consistent with the Board's conclusion that "there are still significant problems [in Romania] due to the former communist regime." So we need not choose between the reports after all. Like the Board, we doubt that Romania has cured itself completely of its brutal history. But we must recognize the substantial record evidence demonstrating that the country at least has turned the corner toward reform.

Ultimately the question in a case such as this one is whether there is substantial evidence that Vaduva lacks a "well-founded fear" of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i). Romania apparently is now democratic enough to vote an incumbent president (Iliescu) out of office. The 1996 election and the more recent conditions in Romania are not in the record, nor was the record supplemented by either party to reflect them. But in addition to the State Department's report, we note that the Board limited its finding of past persecution to a single incident (the Christmas 1992 beating) rather than a campaign of mistreatment, and Vaduva apparently felt comfortable enough to remain in Romania until he obtained a job

on a cruise ship in August 1993. In addition, he does not claim that he was physically assaulted after the December 1992 incident. Having been beaten once, it might seem severe to conclude that any fear of future mistreatment could not be "well-founded." But our conclusion is dictated by the standard for asylum under our immigration laws. We already have expressed concern over "what is threatening to become an avalanche of groundless asylum appeals by citizens of the formerly communist nations." *Gramatikov*, 128 F.3d at 620. Vaduva's appeal was not groundless (his attorney in fact marshaled a solid case on his behalf), but in the end it fails like others because it cannot overcome a simple reality: a dramatic change has swept through the Balkan countries, making asylum in this one unnecessary.

No doubt Romania is a less, probably much less, desirable place to live than the United States. The record nevertheless reveals that conditions have improved substantially since the regime of Ceausescu, and also since the defeat of Iliescu. While past events, including one incident found to be persecution, surely leave a sour memory, there is substantial evidence that Vaduva lacks a wellfounded fear of future persecution in Romania. For all of these reasons, we affirm the Board's decision in all respects.

AFFIRMED.