**Abdelkrim BELKHOS, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE and John Ashcroft, Respondents.**

**No. 00–3463.**

United States Court of Appeals, Seventh Circuit.

Argued May 17, 2001.

Decided Sept. 11, 2002.

Before WOOD, Jr., KANNE, and ROVNER, Circuit Judges.

## ORDER

Abdelkrim Belkhos, a native and citizen of Algeria, petitions for review of a decision of the Board of Immigration Appeals ("BIA") dismissing his appeal from an immigration judge's denial of his application for asylum. In his asylum application, Belkhos claimed that he suffered past persecution and has a well-founded fear of future persecution because of his membership in the Islamic Salvation Front ("FIS"), an Islamic fundamentalist political group banned by the Algerian government. Because the immigration judge and the BIA concluded incorrectly that Belkhos had not suffered past persecution, we grant the petition for review, reverse the decision of the BIA, and remand for further consideration.

## I. Background

Belkhos and his brother Youcef joined the FIS in 1990. Belkhos testified at his asylum hearing that the FIS sponsored a national labor stoppage in 1991 to protest the existing political regime in Algeria. Belkhos actively participated in this protest, helping to organize a labor strike at the chemical factory where he worked. In May 1991 government security forces arrested Belkhos, held him for twenty-four hours, and questioned him about the strike and the FIS members responsible for organizing it. Belkhos refused to answer their questions or to renounce the FIS.

Belkhos and his brother continued their FIS activities. They organized meetings and distributed literature on behalf of the FIS, and campaigned for FIS candidates in the Algerian elections to be held in late 1991 and early 1992. According to the U.S. Department of State's 1992 Country Report for Algeria, the FIS won the first round of elections for the National Assembly that took place in December 1991. On January 11, 1992, the army, and certain army sympathizers within the government, forced the Algerian president to resign; the next day the new military establishment canceled the second round of national elections. A few days later, the army and police force installed a five-member High State Committee to preside over the Algerian government.

The Country Reports issued by the State Department in subsequent years paint a grim picture of the human rights situation in Algeria. As many as 3,000 Algerian citizens disappeared in January and February 1992; most were discovered many months later in detention camps. According to the 1994 Country Report, the military establishment banned the FIS shortly after taking power and declared FIS activities illegal. Most FIS leaders were jailed. The government arrested, detained, and imprisoned FIS members, members of other, more radical Islamic organizations, and individuals suspected of terrorist activities. Special anti-terrorist courts were established to prosecute terrorists and those who sympathized with the Islamic fundamentalist agenda. In 1993 these courts handed down over 300 death sentences, more than half of them in absentia. Armed conflict between the military establishment and guerilla groups who sought to overthrow the government escalated after the coup and continues today. Every Country Report issued by the State Department from 1993 through 2001 remarks that the military arbitrarily detains citizens and that many of these detainees have been tortured or

killed. According to the 2001 Country Report, approximately 100,000 Algerians have died since the conflict began in 1992.

At his asylum hearing, Belkhos testified that military authorities arrested Belkhos and his brother in February 1992 on the basis of their past and current FIS activities. Belkhos claimed that he was detained for two days at police headquarters, where his interrogators tortured him with electric shocks. The police also forced Belkhos to drink contaminated toilet water and insulted members of his family. The authorities held Belkhos's brother for eight months in a prison camp in the middle of the Sahara Desert.

Belkhos testified that he lost his job because he participated in the labor strike in 1991. He said that he went to Italy in the spring of 1992 to work and returned in June 1993. Belkhos explained that he believed Italy did not welcome North African immigrants and that it would be better to come to the United States.

Belkhos entered the United States in October 1992 on a six-month tourist visa. In the spring of 1993, Belkhos received letters from his wife and brother in Algeria, warning him that military authorities were looking for him. One of the letters told Belkhos that the special anti-terrorist court had sentenced him in absentia to a prison term of one and a half years; the letter did not specify what charges had been brought against him.[1]

Belkhos overstayed his visa, and the Immigration and Naturalization Service ("INS") began deportation proceedings in May 1993. At a hearing on October 13, 1993, Belkhos conceded his deportability but requested asylum under section 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a), asserting that, because of his affiliation with the FIS, he would be persecuted if he returned to Algeria. An immigration judge held a hearing in April 1994 on the merits of Belkhos's asylum application. Belkhos testified that he had been detained, abused, and tortured by Algerian authorities on account of his FIS membership. He also offered into evidence the letters he received from his wife and brother.

The immigration judge denied Belkhos's application. Although the immigration judge believed Belkhos's testimony regarding his arrest and torture in February 1992, he did not believe that this isolated episode rose to the level of past persecution:

> [T]his was a difficult case to decide.... I certainly believed his [Belkhos's] testimony concerning the physical abuse that he received during that one incident in February, 1992. Now the question is, is that sufficient standing alone to constitute past persecution and, if it is not, does the respondent have a reasonable possibility of future persecution.

Nor did the judge believe that Belkhos had a well-founded fear of future persecution; the judge observed that Belkhos's immediate family in Algeria had come to no harm in his absence, that he had voluntarily returned to Algeria from Italy in 1992 after his arrest and torture, and that it was "just speculation on the respondent's part that he's being sought in Algeria for his political activities." In August 2000 the BIA dismissed Belkhos's appeal of this ruling, adopting the decision of the immigration judge.

## II. Analysis

Where, as here, the BIA summarily adopts the decision of the immigration judge, we review the immigration judge's factual findings and reasoning as though

---

1. Nothing in the record indicates that Belkhos engaged in or supported terrorist activities.

they were the Board's. *Mousa v. INS,* 223 F.3d 425, 428 (7th Cir.2000). We therefore review the immigration judge's asylum determination under the substantial evidence test. *Id.* We will refrain from disturbing the immigration judge's factual findings unless the record lacks substantial evidence in support of them. *Id.*

Belkhos argues that the immigration judge's determination that he did not have a well-founded fear of persecution by Algerian authorities was not supported by substantial evidence. According to Belkhos, his arrest and torture and his membership in the FIS, combined with current country conditions in Algeria, demonstrate a likelihood that he would experience future persecution upon return and that he therefore should be granted asylum.

To demonstrate that he is eligible for asylum under the INA, Belkhos must prove either that he has suffered past persecution or that he has a well-founded fear of future persecution. *See Begzatowski v. INS,* 278 F.3d 665, 669 (7th Cir.2002). A finding that a petitioner has suffered past persecution creates a rebuttable presumption that he has a well-founded fear of future persecution and is thus eligible for asylum. *Id.* To be granted asylum on the basis of a well-founded fear of future persecution, a petitioner must demonstrate with credible and specific evidence that he has good reason to believe that he will suffer persecution upon return to his native country. *Vujisic v. INS,* 224 F.3d 578, 580 (7th Cir.2000). The immigration judge here credited Belkhos's account of physical abuse during his February 1992 detention but reasoned that the torture he endured was not past persecution under the INA. The immigration judge also rejected Belkhos's argument that this episode of abuse served as a basis for a well-founded fear of future persecution.

The INA does not define "persecution." But this court has defined persecution under the INA as "punishment" or "infliction of harm" for political, religious, or other illegitimate reasons "that rises above the level of mere 'harassment.'" *Tamas–Mercea v. Reno,* 222 F.3d 417, 424 (7th Cir. 2000).

At issue here is whether this "punishment" or "infliction of harm" must occur on more than one occasion to rise to the level of persecution. In concluding that Belkhos was not eligible for asylum, the immigration judge assumed that a "single act" or "isolated incident" cannot, by itself, constitute persecution:

> Even assuming that I find the respondent was abused as he testified to in February, 1992, I do not find that this isolated incident or single act of physical abuse constitutes past persecution within the meaning of the Immigration and Nationality Act.... I do not find that the respondent's one incident compels a finding of past persecution.

But this court has more than once based a finding of past persecution on a single episode of physical abuse. *See Asani v. INS,* 154 F.3d 719, 723 (7th Cir.1998); *Vaduva v. INS,* 131 F.3d 689, 690 (7th Cir.1997). In *Vaduva,* for instance, we noted that a single beating in which a petitioner was punched and bruised and his finger broken constituted past persecution that made him presumptively eligible for asylum. 131 F.3d at 690. And in *Asani,* this court rejected the BIA's determination that a single beating in which a petitioner lost two teeth did not constitute persecution. The BIA believed Asani had not been persecuted because the beating lasted "only a few hours" and the petitioner "apparently did not suffer any serious injuries." *Asani,* 154 F.3d at 722. We explained that physical abuse need not cause "serious injury" to qualify as perse-

cution and disagreed with the BIA's conclusion that the loss of two teeth was not a "serious injury." *Id.*

Additionally, in a case strikingly similar to Belkhos's, the Ninth Circuit found that a single incident of torture was sufficient to establish past persecution. *See Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir.2000). Like Belkhos, Kataria, an Indian Sikh, was arrested and detained by police because of his affiliation with a forbidden religious and political organization. *Id.* at 1110. And like Belkhos, Kataria was, on a single occasion, subjected to electric shock torture. *Id.* According to the Ninth Circuit, Kataria's credible testimony that he had been tortured "compel[led] the conclusion that Kataria [had] established past persecution on account of his political opinion." *Id.* at 1114.

The torture that Belkhos endured was at least as harmful and horrifying as the physical abuse experienced by the petitioners in *Vaduva* and *Asani.* And the single incident of electric shock torture that Belkhos presents is virtually identical to the incident that supported the Ninth Circuit's finding of past persecution in *Kataria.* We conclude that Belkhos has suffered past persecution and that he is therefore presumptively eligible for asylum.

We readily distinguish the cases that the immigration judge relied on in concluding that a single incident cannot constitute persecution. *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990); *Kubon v. INS*, 913 F.2d 386, 388 (7th Cir.1990). None of the petitioners in these cases claimed to have been physically abused or tortured. In *Skalak*, we concluded that a brief detention and mild harassment did not constitute past persecution. 944 F.2d at 365. In *Zalega*, we found that a petitioner who was incarcerated and interrogated but not otherwise mistreated had not suffered persecution. 916 F.2d at 1260. And in *Kubon*, we determined that authorities who detained a petitioner for five days without physical mistreatment had not persecuted him. 913 F.2d at 388.

These cases establish that detention and mild harassment are not sufficient to support a finding of past persecution. Belkhos, however, was not merely detained and harassed. Had the authorities only interrogated Belkhos, he would stand in the same position as the petitioners in *Skalak, Zalega,* and *Kubon.* But the authorities not only questioned Belkhos, they tortured him with electric shocks, and torture can qualify as persecution. *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir.1996).

According to Belkhos, this instance of past persecution proves that he has reason to fear for his safety should he return to Algeria. Once a petitioner establishes past persecution, the burden falls upon the INS to show that the petitioner's fear of future persecution is not well-founded. *Asani*, 154 F.3d at 724. If Belkhos was tortured, then Belkhos was entitled to a rebuttable presumption that he was eligible for asylum on the basis of a well-founded fear of future persecution.

In sum, the immigration judge made two errors: he found that the torture Belkhos endured was not persecution, and, as a result, he did not shift to the INS the burden of demonstrating that Belkhos's fear of future persecution was not well-founded. We make no comment as to the merits of Belkhos's claim for asylum. We remand only so that the BIA may reevaluate the evidence in this case. The petition for review is GRANTED, and the judgment of the BIA is REVERSED and REMANDED for further proceedings consistent with this order.