In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3186

HAO ZHU,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A78-289-252.

ARGUED FEBRUARY 21, 2006—DECIDED SEPTEMBER 29, 2006

Before BAUER, KANNE, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Hao Zhu, a citizen of the People's
Republic of China, appeals the denial of his request for
asylum, withholding of removal, and protection under the
Convention Against Torture (CAT). We deny Zhu's peti-
tion for review.

## I. Background

The government commenced removal proceedings against
Zhu after he attempted to enter the United States at
Chicago's O'Hare International Airport on September 16,
2000. At a January 14, 2003 hearing, Zhu submitted an
application for asylum, a request for withholding of removal

under the Immigration and Nationality Act (INA), and a request for deferral of removal under the CAT. Zhu indicated in his I-589 form that his asylum request was based on political opinion.

Although the immigration judge (IJ) did not credit portions of Zhu's testimony, he stated that "on aspects related to his relationship with his girlfriend, Yun Dong, [Zhu's testimony] should be full[y] credited." Because of the IJ's credibility determination, the facts are undisputed. Zhu impregnated Dong in early 2000. On April 7, he admitted to school officials that he was responsible for her pregnancy. When the family planning commission ordered Dong to appear at the hospital on April 8, she decided to travel to Shan Ming City to hide. That day, family planning officials came to Zhu's home looking for Dong. They kicked and struck Zhu with fists in an attempt to bring him to the police station. Zhu also was hit on the head with a brick, an injury that required seven stitches. When Zhu started bleeding, the officials asked him to turn himself in after seeking treatment. They did not detain him. Zhu later traveled to Shan Ming City to find Dong, who, unbeknownst to him, had already returned home, been discovered, and forced to abort the pregnancy. After returning home and speaking with Dong, Zhu decided to leave for the United States. Upon his arrival at O'Hare, he stated that he left China because of the coercive birth control policy. He also stated that he would possibly be jailed if he returned.

The IJ ruled that Zhu failed to establish either past persecution or a well-founded fear of future persecution, and denied his request for asylum, withholding, and deferral of removal. After the BIA affirmed the IJ's decision, Zhu petitioned for review.

## II. Discussion

When the BIA summarily affirms, we review the IJ's decision. *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir.

2005). We review the BIA's factual determinations under the highly deferential substantial evidence standard. *Dandan v. Ashcroft*, 339 F.3d 567, 572 (7th Cir. 2003). We will not grant the petition for review unless the petitioner demonstrates that "the evidence not only supports [reversal of the BIA's decision], but *compels* it." *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004) (quoting *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (emphasis in original)).

## A. Asylum

To establish eligibility for asylum, an applicant must demonstrate that she is a "refugee" within the meaning of the INA by proving that she was persecuted in the past or has a well-founded fear of future persecution on account of her race, religion, nationality, membership in a social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42)(A); *Liu*, 380 F.3d at 312. The applicant bears the burden of demonstrating persecution. *See* 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a). We have previously defined persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Nakibuka*, 421 F.3d at 476 (citing *Liu*, 380 F.3d at 312). Although an asylum applicant need not show that her life or freedom were threatened, the harm suffered must rise above the level of "mere harassment" and result from more than unpleasant or even dangerous conditions in her home country. *Id.*

### 1. Past Persecution

Zhu first claims that he suffered past persecution, in the form of a beating by family planning officials, on account of his resistance to China's family planning policies. Although the IJ credited Zhu's testimony regarding his mistreatment,

he determined that the facts did not warrant a finding of past persecution. The testimony reveals that the officials beat Zhu on this one occasion alone. Past persecution may be demonstrated by a single episode of physical abuse, if it is severe enough. *Dandan*, 339 F.3d at 573. Zhu's beating required medical attention and, he claims, caused an injury that is comparable to other allegations of serious and specific physical abuse which we have found to constitute past persecution. While a cut requiring seven stitches is doubtless a substantial injury, however, we must consider all of the circumstances of the incident in specific detail, for "it is the details that reveal the severity of" the abuse at issue. *Liu*, 380 F.3d at 313. A thorough review of the relevant case law reveals that physical injury serious enough to compel a finding of past persecution is typically accompanied by one or more additional factors that are not present here.

For instance, we found that the facts compelled a finding of past persecution where a severe beating resulted in the petitioner's miscarriage, but that petitioner was also physically assaulted on two other occasions, detained twice, and threatened with sexual assault once. *See Vladimirova v. Ashcroft*, 377 F.3d 690, 692 (7th Cir. 2004). The evidence likewise compelled reversal where the petitioner's face was cut with a razor, but that petitioner was beaten on four separate occasions over the course of two months and was forced to watch his wife being raped. *See Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003). We remanded to the BIA on the question of past persecution where a petitioner's beating resulted in the loss of two teeth, but the petitioner was also detained and handcuffed to a radiator for two weeks in a cell with only enough room to stand, deprived of sufficient food and water, and detained and questioned on a separate occasion. *See Asani v. I.N.S.*, 154 F.3d 719, 723 (7th Cir. 1998). Lastly, we held that the evidence compelled reversal where the petitioner sustained injuries requiring

three days of medical care; the petitioner was also detained for two weeks, beaten daily, given only minimal food and water, and had salt literally rubbed into his wounds. *See Soumahoro v. Gonzales*, 415 F.3d 732, 737-38 (7th Cir. 2005). In each of these cases, then, there were further incidents of abuse, such as detention, repeated beatings, and other humiliating or harmful acts beyond the resulting physical injury. Zhu endured only the single beating, was never detained, and was never subjected to additional abuse. Although Zhu's physical injury is arguably as substantial as the ones suffered in these cases, the overall experiences endured by these petitioners were at once both more prolonged and more severe than that which Zhu encountered. To be clear, we by no means seek to minimize Zhu's ordeal; we endeavor only to illuminate the distinctions essential to ruling on such a fact-specific determination.

In another group of cases, we have reviewed the BIA's analysis of the petitioner's single episode of physical abuse. First, we upheld the BIA's finding of past persecution where the petitioner suffered a bruised face and broken finger from a single Christmas Eve beating. *Vaduva v. I.N.S.*, 131 F.3d 689, 690 (7th Cir. 1997). Although the Christmas Eve beating alone supported the BIA's finding, we incidentally noted that Vaduva was beaten on another occasion and endured "harassing telephone calls, warnings, and at least one interrogation." *Id. Vaduva* also differs from the present matter in its procedural posture; there, we upheld the BIA's finding of past persecution as supported by substantial evidence, whereas here we are asked to reverse the BIA and hold that the evidence compels such a finding. *Id.* Under the substantial evidence standard of review, we reverse "only if 'no reasonable fact-finder could fail to find' that [the petitioner] had suffered from past persecution." *Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003) (quoting *Georgis v. Ashcroft*, 328 F.3d 962, 967-68 (7th Cir. 2003)).

In a second case involving "a single episode of detention or physical abuse," we upheld the BIA's finding of no past persecution where the petitioner was beaten until his face was swollen and was detained for three days without food. *See Dandan*, 339 F.3d at 571. In so ruling, we noted that Dandan did not present the specifics of his injury that would "indicate the severity of the beating and support its claim to be considered persecution." *Id.* at 574. We distinguished *Asani*, where the petitioner lost two teeth, and *Vaduva*, where the petitioner suffered a bruised face and broken finger. *See id.* Although the specific nature of Zhu's injury, a cut requiring seven stitches, would seem to differentiate his case from *Dandan*, we also noted that such specifics are not "the *sine qua non* of persecution." *Id.* The result, moreover, rested equally on the fact of Dandan's single detention; we noted that "[a]lthough the frequency issue is not dispositive, it does figure significantly in the analysis." *Id.* at 573. This factor militates against Zhu's position, for he encountered the authorities but once.

In again upholding the BIA's finding of no past persecution, we emphasized that the petitioner had to endure only "a singular event" of pushing and hair-pulling, even though she was detained for two days, interrogated, and had her apartment ransacked. *See Liu*, 380 F.3d at 313. In both *Liu* and *Dandan*, then, we upheld the BIA's finding of no past persecution based in part on the fact that the petitioner, like Zhu, encountered only a single instance of abuse. The severity and specificity of the injury Zhu describes, however, is more on the order of the petitioner's injury in *Vaduva*. Another recent case helps to illustrate these countervailing factors; in it we upheld the BIA's decision that no past persecution resulted from an unspecified injury to the petitioner's hands, even though the police interrogated him three times, detained him for twenty-four hours, harassed him for money, and threatened to kill him. *Prela v. Ashcroft*, 394 F.3d 515, 517-18 (7th Cir. 2005). Although the injury Zhu describes is more serious and specific than

the injury suffered in *Prela*, his ordeal on the whole is less serious in that he was never detained and never endured additional humiliating or harmful official action (such as the repeated encounters with, and threat from, the police). His injury weighs in favor of a finding of persecution, but is without the typical accompanying factors that we have previously deemed significant.

In short, none of our past cases is precisely on point. All in all, though, we find that the evidence of this isolated beating does not compel a finding of past persecution. Essential to this ruling is our understanding of the deferential nature of substantial evidence review. *See Prela*, 394 F.3d at 518; *Liu*, 380 F.3d at 313-14; *Dandan*, 339 F.3d at 573-74 (describing substantial evidence, in the context of reversal, as "a high standard and one that is properly difficult to meet without powerful and moving evidence"). While the officials' treatment of Zhu in China was undeniably deplorable, substantial evidence supports the BIA's determination.

Zhu next argues that he suffered past persecution because his girlfriend Dong was forced to have an abortion. The definition of "refugee" was amended to provide that:

> a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion.

8 U.S.C. § 1101(a)(42)(B). The BIA has previously interpreted this language so that "past persecution of one spouse can be established by coerced abortion or sterilization of the other spouse." *Matter of C-Y-Z-*, 21 I. & N. Dec. 915, 917 (BIA 1997). The IJ held that Zhu's status as the boyfriend of a woman who was forced to abort her pregnancy did not entitle him to a finding of past persecution under the amendment. This legal determination is subject to *de novo*

review. *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003).

We have interpreted the language of the amendment as affording protection to spouses in cases "[w]here a traditional marriage ceremony has taken place, but is not recognized by the Chinese government because of the age restrictions in the population control measures." *See Zhang v. Gonzales*, 434 F.3d 993, 999 (7th Cir. 2006). Zhu cannot claim this protection for himself, however, because he and Dong engaged in no marriage ceremony; they were simply boyfriend and girlfriend. There was not even a suggestion that they had planned to wed. A case that we recently decided controls. *See Chen v. Gonzales*, No. 04-1126, 2006 WL 2256981 (7th Cir. Aug. 8, 2006). We, like other circuits, have declined to expand the definition of "refugee" to include the boyfriends of women who are forced to abort a pregnancy. *See id.* at *4; *see also Zhang v. Ashcroft*, 395 F.3d 531, 532 (5th Cir. 2004); *Chen v. Ashcroft*, 381 F.3d 221, 227-29 (3d Cir. 2004). Zhu cannot demonstrate past persecution on this basis.

## 2. Well-Founded Fear of Future Persecution

Without a finding of past persecution, a person seeking asylum must prove that she genuinely fears she will be persecuted based on a protected ground if returned to her native country, and that her fears are objectively reasonable. *Liu*, 380 F.3d at 312 (citing *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987)). In his brief, however, Zhu does not claim that he has an independent fear of persecution, but rather relies completely on the presumption that arises from a demonstration of past persecution. *See* 8 C.F.R. § 208.13(b)(1); *Dandan*, 339 F.3d at 573. He cannot avail himself of this presumption, however, because we upheld the BIA's finding that he suffered no past persecution.

We additionally note the IJ's correct assertion that the likelihood of Zhu's persecution upon return to China was quite minimal, given the fact that Dong was already forced to abort her pregnancy. When questioned upon his arrival at O'Hare, Zhu stated that he would possibly be jailed if he returned to China. Such an indeterminate suggestion, however, cannot qualify as objectively reasonable. *See Borca v. I.N.S.*, 77 F.3d 210, 214 (7th Cir. 1996) (to establish reasonableness, the "petitioner must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution"). Zhu's fear of possible future arrest seems strange given the officials' decision not to detain him on April 8. In fact, Zhu remained in China until September and was never detained. It is more reasonable to presume that persecution intended to coerce adherence to the family practice policies would cease after the forced abortion was carried out. Zhu fails to demonstrate a well-founded fear of future persecution.

## B.  Withholding and Deferral of Removal

Finally, because Zhu has not met the lesser burden of proof required to establish eligibility for asylum, we decline to consider his claims for withholding of removal under the INA and deferral of removal under the CAT, both of which entail a higher standard of proof. *See Ahmed*, 348 F.3d at 619.

## III.  Conclusion

For the foregoing reasons, we DENY the petition for review.

ROVNER, *Circuit Judge,* dissenting. My colleagues have written a measured decision in response to a difficult recurring asylum problem. The majority's opinion, however, views Zhu's claims piecemeal and concludes that he has not faced persecution. If the whole of his claims are considered, however, the evidence compels a finding of past persecution. For this reason, I dissent.

There is no dispute, of course, that Zhu bases his asylum claim on injuries he suffered as a result of his political beliefs. Opposing and resisting China's coercive population control policy and encouraging others to resist conforming is precisely the type of political opinion that our asylum laws were written to protect. *See* 8 U.S.C. § 1101(a)(42)(B). In the case of pregnant women who have defied Chinese authority by reproducing, Chinese authorities might respond to their opposition by subjecting the women to involuntary abortions or sterilization. U.S. Department of State Country Reports on Human Rights Practices-2003, China, February 25, 2004, p. 12, 29 (hereinafter "Country Report") (R. at 182, 198). For their male partners who voice or encourage opposition, the punishment varies. They may be arrested, fined, sterilized, interrogated, denied employment, government benefits, or property, or subject to any number of discriminatory acts. Country Report, p.12-13 (R. at 181-182). Their female partners might also face abortion or sterilization procedures in response to their resistance.

Zhu resisted China's coercive population control policy in two ways. First, Zhu and his girlfriend, Yun Dong, failed to abide by the government's request that Yun Dong terminate her pregnancy. Second, Zhu abetted Yun Dong in her efforts to hide and refused to cooperate with the authorities' efforts to find her. In response to Zhu's first act of resistance, government officials came to Zhu's house to arrest and detain him in hopes of forcing Yun Dong out of hiding. When Zhu resisted arrest, the officials kicked and

beat him, carrying him into the street where they hit him on the head with a brick causing a head injury requiring seven stitches.

Resolution of this matter should be straight forward. 8 U.S.C. § 1101(a)(42)(B) declares that:

> **a person** who has been forced to abort a pregnancy or to undergo involuntary sterilization, or **who has been persecuted** for failure or refusal to undergo such a procedure or **for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion**, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42)(B) (emphasis added). Government authorities beat and injured Zhu based on his "resistance to a coercive population control program." The only remaining question is whether Zhu's injuries were sufficient to constitute persecution.

As the majority correctly points out, a single episode of physical abuse can be sufficient to sustain a claim of past persecution, if it is severe enough. *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998), *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997). The majority concedes that Zhu's head injury, which required seven stitches, is a serious one but concludes that although "[h]is injury weighs in favor of a finding of past persecution, [it] is without the typical accompanying factors that we have previously deemed significant." Majority opinion at 7. The majority points out that a "physical injury serious enough to compel a finding of past persecution is typically accompanied by one or more additional factors that are not present here." *Id.* at

4. Zhu's beating, however, was accompanied by an additional factor—the forced abortion of his and Yun Dong's fetus.

The majority opinion errs by bifurcating Zhu's claim into discreet parts. First, it looks at Zhu's claim of physical abuse and concludes that the single instance of abuse was, by itself, insufficient to support a claim of persecution. Then, it looks to see whether Zhu's status as the nonmarital partner of a woman forced to abort a pregnancy entitles him, in and of itself, to an automatic finding of past persecution under 8 U.S.C. § 1101(a)(42)(B). Even were I to agree with the majority that, as a matter of law, only husbands and not unmarried partners are automatically deemed to have been persecuted under § 1101(a)(42)(B), neither this court nor the BIA can ignore the fact of a forced abortion when considering the whole of the circumstances surrounding a particular claim of persecution. In other words, the forced abortion inflicted upon Zhu's partner may not be a fact that entitles Zhu to a per se presumption of past persecution (a question I will turn to momentarily), but neither can it be ignored as though it were entirely unrelated to the persecution at issue. The majority thought Zhu's head injury would have been serious enough to compel a finding of past persecution only if it had been accompanied by additional factors, but then ignored the other factors. The authorities did not simply beat Zhu on the head with a brick causing an injury requiring seven stitches. They came to his house in search of his girlfriend, they kicked and punched him, and, most significantly, they aborted his and Yun Dong's fetus, depriving him of the opportunity to parent a child that he and Yun Dong had jointly decided to bring into the world. It seems clear to me that the evidence, when properly viewed as a whole, compels a finding of past persecution, independent of Zhu's relationship to Yun Dong. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

This should, in and of itself, resolve the matter for Mr. Zhu, but the majority's discussion of 8 U.S.C. §1101(a)(42)(B) and its application to non-spouses warrants further thought. As the majority points out, in 1997 the BIA construed this section to provide that the forced abortion or sterilization of one spouse is an act of persecution against the other spouse and that the spouses of those directly victimized are eligible for asylum in this country. *In re C-Y-Z*, 21 I. & N. Dec. 915, 919 (BIA 1997). Interestingly, this application applies to spouses regardless of whether that spouse independently resists or opposes the coercive population control program. A spouse who sits idly by or even supports the termination of his wife's pregnancy nevertheless gets the protection of the statute. The BIA did not offer its rationale for extending the protection to spouses, and despite several years of prodding by the Second Circuit, still has failed to do so. *See Gui Ci Pan v. U.S. Attorney Gen.*, 449 F.3d 408, 415 (2d Cir. 2006). Without such knowledge, it is difficult to know whether there is a rational basis for granting a presumption of past persecution to spouses but not to other men who impregnate women upon whom government authorities force abortions.

To support the proposition that the presumption of past persecution extends only to the husband of a woman who has been forced to have an abortion, the majority relies, in part, on our holding in *Chen v. Gonzales*, 457 F.3d 670 (7th Cir. 2006). The *Chen* decision did indeed "decline to extend the definition of 'refugee' to reach boyfriends" where there has been no extra-governmental marriage ceremony. *Id.* at 674. The holding in *Chen*, although not directly in conflict with any prior circuit decision, leaves the circuit law on this issue in an odd state of affairs. Eight months before our decision in *Chen*, we granted asylum to Junshao Zhang. *Zhang v. Gonzales*, 434 F.3d 993 (7th Cir. 2006). Zhang and his wife had a traditional Chinese wedding ceremony at home, but never officially registered the marriage because

neither had reached the legal age for marriage in China. *Id.* at 995. We held that "[w]here a traditional marriage ceremony has taken place, but is not recognized by the Chinese government because of the age restrictions in the population control measures, that person nevertheless qualifies as a spouse for purposes of asylum." *Id.* at 999. We reasoned that to hold otherwise would create a Catch-22.

> Zhang's asylum claim was based on China's enforcement of its population control policy, part of which includes a minimum age requirement for marriages, and a minimum age for having children. The forcible abortion in this case occurred precisely because Zhang and his wife married and became pregnant prior to those minimum ages. The marriage is not legal in China because of the population control policy.

*Id.*

Despite this reasoning in *Zhang*, in *Chen* we declined to extend the protections of the asylum law to a man in significantly similar circumstances. *Chen*, 457 F.3d at 675. Yaun Rong Chen, like Zhang, attempted to register for a marriage license, and like Zhang, the authorities denied him the license because he and his partner, Li Ping, were too young to be legally married. *Id.* at 672. Unlike Zhang, however, who responded to the license denial by having a non-sanctioned wedding ceremony, Chen and Li Ping opted to co-habitate. *Id.* As with Zhang's partner, Li Ping subsequently became pregnant. Chen's efforts to marry did not end there. He tried once again to become Li Ping's lawful husband by applying for a marriage license a second time in light of Li Ping's pregnancy. *Id.* at 672. Instead of issuing the license, the town government sent a letter demanding that Li Ping "voluntarily" submit to an abortion. *Id.* In just a matter of days, population control officials found Li Ping and took her to a hospital to terminate her pregnancy. *Id.* Despite Chen's two failed attempts at

obtaining a marriage license, his co-habitation with Li Ping, and his efforts, in concert with Li Ping, to start a family, this circuit declared that Chen was merely a boyfriend and declined to extend to him the presumptions of § 1101(a)(42)(B). *Id.* at 674.

In short *Chen* and *Zhang* together, lead to an odd distinction. Men who apply for a marriage license, are denied, and enter into a traditional common law marriage in defiance of China's laws can claim the protections of § 1101(a)(42)(B). Men who apply for a marriage license, are denied, heed the law of the land and merely cohabitate, cannot. The latter holding ignores the rationale of *Zhang* which recognized that it was China's oppressive population control measure that prevented Zhang from getting married and thus being able to take advantage of the protections of § 1101(a)(42)(B) in the first place. This is the Catch-22 to which we referred in *Zhang. See also Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) ("[t]he BIA's refusal to grant asylum to an individual who cannot register his marriage with the Chinese government on account of a law promulgated as part of its coercive population control policy, a policy deemed by Congress to be oppressive and prosecutory, contravenes the statute and leads to absurd and wholly unacceptable results.") In short, in *Zhang, Chen, Ma* and the instant case, a woman was forced to terminate a pregnancy solely because she was not married, and the reason she was not married was because of China's restrictive population control program.

We are treading, I fear, on indefensible ground, by relying on the persecuting country to define the parameters of a legitimate marriage. Suppose, for example, two men appear before an immigration judge in separate cases and claim that government officials forced their female partners to abort a pregnancy. The cases are identical in all respects except in the first case the couple married under the official laws of the country. In the second case, the couple applied

for a marriage license but was denied because the country in which the couple resided prohibits marriages between those who are black (as is the husband) and those who are white (as is the wife). I could, of course, paint a similar scenario replacing race with religion. In fact, in *Qu v. Gonzales*, 399 F.3d 1195 (9th Cir. 2005), Qu and his wife were denied a birth permit because Qu's family was affiliated with counter-revolutionary elements who adhered to Christian beliefs. *Id.* at 1197. It is likely that Chinese officials have denied marriage licenses to other couples based on a family history of unpopular political activity. These are precisely the sorts of restrictions on basic human rights that this country's asylum laws were meant to protect.

The BIA need not extend asylum to every man who has impregnated a woman who was later forced to terminate a pregnancy, but I would not draw the line so solidly between married and not married. The important inquiry, it seems, ought to be the nature of the relationship between the asylum applicant and the woman who has been forced to terminate her pregnancy. *See Ma*, 361 F.3d at 557 ("[w]hether or not the persecuting country, China, would decline to recognize the marriage on technical grounds . . . has little, if anything, to do with [an] asylum application.") *Id.* In short, the competing goals of our asylum laws—to harbor those in need of asylum while weeding out illegitimate claims—can best be met in cases involving § 1101 (a)(42)(B) by making the following inquiry: is the couple at issue involved in a spouse-like relationship where both parties have demonstrated an intent to enter into and sustain a long-term partnership for the purpose of raising a child together, and but for the persecuting country's restrictive population control measures, the couple would have married. In this case, Zhu testified that he did not marry his partner, Yun Dong, because both he and Dong were too young to do so under Chinese law. (R. at 127-128).

He did vow to support the child and, along with his parents, help raise the child, (R. at 125, 128), and therefore demonstrated a commitment to establishing a "family" as best as he could. The parents of the two teens also agreed together that they would attempt to keep and help raise the child. (R. at 105-06, 124-25). This is probably sufficient to establish the type of commitment I describe, but in any event it is a factual inquiry that ought to be made on a case-by-case basis.

The government argues that a bright line rule advances the agency's interest in weeding out fraudulent claims. Such an argument is appealing but not entirely satisfying. Many people flee persecution without packing in their bags documentary evidence of the persecution. *Gjerazi v. Gonzales*, 435 F.3d 800, 809 (7th Cir. 2006). Many asylum applicants likely lack proof of a state sanctioned marriage, and even fewer have proof of engaging in a "traditional marriage ceremony." Those who do have such proof are unlikely to have documentation of a forced abortion. The agency has indeed drawn a line, but whether it has any relationship to ferreting out illegitimate asylum claims is speculative at best.

In sum, putting aside the application of §1101(a)(42)(B) to unmarried partners for a moment, I would find that Zhu suffered past persecution because he was himself persecuted for resisting China's coercive population control program. Furthermore, because Zhu adamantly opposes the coercive birth control policies of China, he has a reasonable fear of future persecution should he return. The majority reasons that because Zhu's partner has already been forced to abort her pregnancy, Zhu is unlikely to be subject to further persecution. Majority opinion at 9. The majority misunderstands the nature of Zhu's persecution. The government authorities persecuted Zhu because of his opposition and resistance to China's oppressive birth control policies. There is no evidence that he has changed his

beliefs. To the contrary, one would imagine that Zhu's personal experience has further fanned the fires of his opposition. Furthermore, Zhu is still subject to all of China's population control measures including a limit on the number of children, further forced abortions, and underage marriage regulations should he choose to marry a woman younger than the limit set by Chinese authorities. *See Zhang*, 434 F.3d at 1002. Moreover, it would be convoluted indeed "to allow the act of persecution itself to constitute the change in circumstances that would result in the denial of asylum." *Id.* at 1001. We should not penalize the persecuted simply because a persecutor has successfully overcome one particular act of resistance.

That alone should be sufficient for a finding of fear of future persecution, but both this court and the BIA have noted that a forced abortion creates ongoing suffering that also suffices for a finding of a well-founded fear of future persecution. *Zhang*, 434 F.3d at 1001-02; *In re Y-T-L*, 23 I. & N. Dec. 601, 607 (BIA 2003). The BIA has specifically held that the fact that an asylum applicant (or the wife of an asylum applicant) has been permanently sterilized and therefore cannot be persecuted in this manner again, cannot constitute a change of circumstances for purposes of determining "fear of future persecution." *In re Y-T-L*, 23 I. & N. Dec. at 607. Sterilization is a "permanent and continuing act of persecution that has deprived a couple of the natural fruits of conjugal life and the society and comfort of the child or children that might eventually have been born to them." *Id.* The BIA noted that this reasoning held even more sway in the case of a forced abortion where the persecution could be repeated with future pregnancies. *Id.* The forced abortion deprived Zhu of the opportunity that the fetus presented—to someday parent that child and to realize the family that he and Yun Dong together desired and agreed to create. *Zhang*, 434 F.3d at 1001. The effect of that loss is ongoing and permanent. *See, e.g.*, *Qu*, 399 F.3d

at 1202, n.8 (forced abortion causes irremediable and ongoing suffering of being permanently denied the potential for parenthood).

In response to Zhu's fear of future persecution, the government's sole argument is that Zhu could avoid punishment from his former local population control officials by relocating to another region within China. Such a life on the run might successfully prevent him from being arrested again (although if the government officials were serious about catching him, he might expose himself to trouble merely by registering to work and by paying taxes), but it certainly would not protect him from persecution for future acts in defiance of the population control policies. Although enforced erratically in various portions of the country, the policy is a national one that Zhu could not escape by relocating within the country. *See* Country Report, pp. 12-13 (R. at 181-182). Furthermore, "the fact that a person might avoid persecution through concealment of the activity that places her at risk of being persecuted is in no wise inconsistent with her having a well-founded fear of persecution." *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2005). We cannot require Zhu to avoid persecution by concealing or altering his strongly held political beliefs.

Chinese authorities persecuted Zhu for his beliefs in the past, and because he has an objectively reasonable fear of future persecution should he return, I would grant the petition for review and hold that Zhu is eligible for asylum.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*