**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 26, 2006
Decided December 23, 2008

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 07-4028

| | | |
|---|---|---|
| YURY RUPEY, | | Petition for Review of an Order of the |
| | *Petitioner*, | Board of Immigration Appeals |
| *v.* | | No. A95-151-221 |
| MICHAEL B. MUKASEY, | | |
| | *Respondent*. | |

**O R D E R**

Yury Rupey is a Ukrainian citizen who applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied his applications after concluding that Rupey failed to show that the Ukrainian government was responsible for his mistreatment, that Rupey's mistreatment did not amount to persecution, and that Rupey lacked a well-founded fear of future persecution. The Board of Immigration Appeals ("BIA") affirmed. Because substantial evidence supports the decisions of the IJ and the BIA and the record does not compel a contrary conclusion, we deny Rupey's petition for review.

Rupey entered the United States without inspection in December 2000. Shortly thereafter, Rupey sought asylum by claiming he had been persecuted in Ukraine because he was a Baptist. Over the course of the 44 years that Rupey lived in Ukraine, he said he had been attacked on at least 12 occasions because of his proselytization activities. Most of Rupey's evidence related to the four most serious assaults: a 1975 beating during a baptismal ceremony, a 1996 assault that left him hospitalized for two days with facial injuries and stomach bleeding, a February 2000 burglary and vandalism of his apartment, and a May 2000 assault against Rupey and his wife at a market where Rupey suffered a concussion and other head injuries. Despite these attacks, Rupey testified that he and his family openly continued to practice their faith and proselytize until he left Ukraine in late 2000.

The identities of Rupey's attackers remain unknown. Rupey testified that he did not know who attacked him but speculated that his assailants were "Ukranian nationalists." While Rupey offered conflicting theories as to the groups he believed assaulted him, he never asserted that the government was directly responsible for his beatings. Although Rupey, his wife, and his pastor filed complaints with the police, Rupey claimed authorities refused to investigate his allegations because they were controlled by the same nationalist forces that attacked him.

The government initiated removal proceedings in 2001. Rupey conceded removability but renewed his request for asylum and sought protection from removal under the Immigration and Nationality Act and the CAT. The IJ denied Rupey's applications. While noting that Rupey's testimony occasionally lacked specificity and contradicted his earlier written submissions, the IJ generally treated Rupey's testimony as credible. Nevertheless, the IJ found that the attacks Rupey suffered, to the extent they could be connected to his Baptist faith, were not sufficiently severe to be classified as persecution. The IJ also concluded that even if the attacks were sufficiently severe, the Ukrainian government had no connection to the assaults and was neither unwilling nor incapable of preventing the assaults. Finally, in light of Rupey's testimony that his wife and son remain in Ukraine and freely practice their faith, the IJ concluded that Rupey's fear of future persecution was not well-founded. After the BIA affirmed the IJ's decision, Rupey filed this petition for review.

The Attorney General has discretion to grant an alien asylum if the alien is a refugee. *See* 8 U.S.C. § 1158(b)(1). A refugee is defined as an individual who is either unwilling or unable to return to his native country "because of persecution or a well-founded fear of persecution on account of . . . religion." *Id.* § 1101(a)(42)(A). When the BIA adopts the decision of the IJ, as it did in this case, we review the IJ's decision as supplemented by the decision of the BIA. *See BinRashed v. Gonzalez*, 502 F.3d 666, 670 (7th Cir. 2007). Our review of the agency's decision is extremely deferential; we will uphold the decision if it is

"supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). Reversal is warranted only if "the evidence *compels* a different result," and we will not overturn the agency's findings simply because we might have decided the case differently. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).

One way Rupey can establish refugee status is if he demonstrates that he is the victim of past persecution because of his Baptist faith. An alien can obtain asylum by showing that he has been subject to past persecution, which creates a rebuttable presumption that the alien has established a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). An alien shows past persecution if he demonstrates (1) government involvement and (2) sufficiently severe mistreatment. *See Hernandez-Baena v. Gonzales*, 417 F.3d 720, 724 (7th Cir. 2005). Rupey's past-persecution claim fails because he cannot establish either element.

First, persecution requires government involvement. Persecution "is something a *government* does, either directly or by abetting (and thus becoming responsible for) private discrimination by throwing in its lot with the deeds or by providing protection so ineffectual that it becomes a sensible inference that the government sponsors the misconduct." *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005). Rupey must demonstrate that the Ukranian government or nongovernmental actors that the government is unable or unwilling to control were responsible for his mistreatment. *See Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006).

Here, there is no evidence that the Ukranian government was directly involved in Rupey's mistreatment. Rupey provided no evidence to establish the identities of his attackers, and his own testimony merely speculates that his assailants were Ukranian nationalists. The documentary evidence Rupey relies on to support his claim likewise does not suggest any direct connection between the government and Rupey's assailants.

Similarly, Rupey provides no evidence to compel a conclusion that the Ukranian government was unwilling or unable to prevent the attacks. Rupey alleges that the local police accepted his complaints but never investigated the attacks because nationalists had infiltrated the police force. However, to establish governmental responsibility, an alien must provide more specific evidence of police apathy than what Rupey has proffered. *See Hor v. Gonzales*, 421 F.3d 497, 502 (7th Cir. 2005) (attributing actions of radical Islamists to government when military told petitioner it could not protect him from terrorists and Algerian court advised him to "maintain a low profile"); *Guchshenkov v. Ashcroft*, 366 F.3d 554, 557 (7th Cir. 2004) (attributing actions of Kazakh thugs to government when police responded to petitioner's assault report by saying that they had "more important things to take care of"). Here, Rupey's speculative conclusion that nationalist influences prevented

the police from investigating his complaints lacks support in the record. Furthermore, Rupey does not identify what information he provided to the police, whether the information he provided was sufficient to capture his attackers, or whether the police told him they would not investigate his complaint. Given this dearth of evidence, nothing in the record compels the conclusion that either the Ukranian government or private parties the government was unable or unwilling to control were responsible for Rupey's mistreatment.

Second, to constitute persecution, the wrongful behavior must involve harms that "go beyond mere harassment," *Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006), and generally must "threaten death, imprisonment, or the infliction of substantial harm or suffering," *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996). We have previously said that while the definition of "persecution" includes "'actions less severe than threats to life or freedom,'" *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003) (quoting *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000)), it is not so broad as to encompass all conduct that we regard as "'unfair, unjust, or even unlawful or unconstitutional,'" *Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005) (quoting *Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996)). Because "it is the details that reveal the severity of the particular situation," *Liu v. Ashcroft*, 380 F.3d 307, 313 (7th Cir. 2004), establishing the requisite level of persecution to overturn an agency decision is difficult "without powerful and moving evidence," *Dandan*, 339 F.3d at 574.

Here, the record does not compel the conclusion that the mistreatment Rupey suffered rises to the level of persecution.[1] Rupey asserted that as part of his religion, he traveled hundreds of times to different towns within Ukraine to speak about his religion. Yet Rupey claimed he was attacked—kicked, punched, and knocked down—on just a few of these trips. As the IJ properly noted, these incidents lack the severity necessary to designate them as "persecution." *See Zhu v. Gonzales*, 465 F.3d 316, 319 (7th Cir. 2006) (finding no past persecution when officials kicked, punched, and used a brick to strike petitioner on the head). The most serious assaults—the 1996 and 2000 attacks where medical records reveal

---

[1] Rupey suggests that the BIA erroneously evaluated the IJ's decision when it applied the standard that applies to claims of humanitarian asylum. *See* 8 C.F.R. § 208.13(b)(2). Under this standard, which is more stringent than the standard used to determine the existence of past persecution, an IJ can grant asylum if the level of past persecution is "'so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution.'" *Dobrota v. INS*, 195 F.3d 970, 974 (7th Cir. 1999) (quoting *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997)). Admittedly, the BIA's short opinion is not a model of clarity because it only mentioned the humanitarian-asylum persecution standard and avoided discussing the IJ's past-persecution finding. But because the IJ clearly found that Rupey failed to show past persecution, the BIA adopted this portion of the IJ's decision, and the IJ's finding has ample support in the record, Rupey is not entitled to relief.

Rupey sought treatment in a hospital—do not compel a past-persecution finding. Following these incidents, neither of which required him to be hospitalized for more than two days, Rupey continued to proselytize, openly practiced his faith, and chose not to relocate his family. As the IJ concluded, Rupey's decision to continue the religious activities he claims generated these attacks suggests they did not involve the "infliction of substantial harm or suffering." *Sharif*, 87 F.3d at 935. Although Rupey apparently suffered a regrettable degree of mistreatment, the fact that he and his family still freely practiced their religion indicates his mistreatment was more like harassment than persecution. *Cf., e.g.*, *Mema v. Gonzales*, 474 F.3d 412, 417-18 (7th Cir. 2007) (kidnapping at gunpoint, interrogation and beating did not compel a finding of past persecution); *Dandan*, 339 F.3d at 573-74 (three-day detention in which alien was deprived of food and beaten, leaving his face swollen, did not compel a finding of past persecution).

Rupey tries to compare his case to *Gomes v. Gonzales*, 473 F.3d 746 (7th Cir. 2007), and *Vaduva v. INS*, 131 F.3d 689 (7th Cir. 1997). In those cases we classified the harm the petitioners suffered as persecution because they provided significant evidence to establish a connection between their severe mistreatment and their protected activities. For example, in *Gomes*, a Bangladeshi Catholic family proved Muslim fundamentalists ransacked their home, assaulted one family member so severely that he was hospitalized for a week, and repeatedly intimidated other family members because of their religious beliefs. 473 F.3d at 754-55. Likewise, in *Vaduva*, a Romanian citizen suffered a bruised face and a broken finger by strangers who told him to stay away from the pro-democratic forces he supported. 131 F.3d at 690. Unlike the petitioners in *Gomes* and *Vaduva*, Rupey can only speculate that the 1996 and 2000 attacks were religiously motivated; the record contains no indication that his attackers ever referred to his religious activities. Moreover, the persecution in *Gomes* and *Vaduva* occurred over a relatively brief period of time and prompted the petitioners to flee their countries. By contrast the dozen incidents Rupey cites occurred over several decades and do not reflect a similar kind of systematic mistreatment. Accordingly, Rupey's description of his attacks lacks "the sort of specific information that would *compel* a finding of persecution." *Dandan*, 339 F.3d at 574.

Rupey can also establish refugee status if he shows a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(2). This well-founded fear must be "subjectively genuine and objectively reasonable." *Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008). To establish a well-founded fear of future persecution, an alien must present "'*specific, detailed* facts showing a good reason to fear that he or she will be singled out for persecution.'" *Sayaxing v. INS*, 179 F.3d 515, 520 (7th Cir. 1999) (quoting *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir. 1992)). Actions that do not rise to the level of past persecution, such as the attacks Rupey suffered, cannot form the basis for a well-founded fear of future persecution. *See Ciorba v. Ashcroft*, 323 F.3d 539, 545-46 (7th Cir. 2003).

Here, Rupey does not come close to showing his fear of future persecution is well-founded. We have repeatedly noted that since the breakup of the Soviet Union in 1991, Ukrainians have enjoyed significant religious freedom. *See Kharkhan v. Ashcroft*, 336 F.3d 601, 605 (7th Cir. 2003). A 2002 State Department report submitted by Rupey, which postdates Rupey's departure from Ukraine, indicates that evangelical Christian religions in Ukraine have grown rapidly since 1991 and that Evangelical Baptists are the largest Protestant community. BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, UKRAINE: INTERNATIONAL RELIGIOUS FREEDOM REPORT (2002), *available at* http://www.state.gov/g/drl/rls/irf/2002/13988.htm (last visited Sept. 29, 2008). Even a narrow focus on Rupey's specific situation reveals that he is unlikely to suffer any persecution when he returns to Ukraine. As Rupey admits, his wife and son continue to live and worship freely in Ukraine. Although Rupey fears he will be attacked again if he returns to Ukraine, he cannot identify with specificity the facts we need to overturn the agency's decision. In sum, nothing in the record compels the conclusion that Rupey will be persecuted if he returns to Ukraine.

Rupey also challenges the agency's decision to deny his application for withholding of removal under the Immigration and Nationality Act and protection against removal under the CAT. However, Rupey's failure to prevail on his asylum claim necessarily precludes success under his withholding of removal and CAT claims because the standard for asylum is the most lenient of the three. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(c)(2); *Aung v. Gonzales*, 495 F.3d 742, 746-47 (7th Cir. 2007) (requiring a showing of clear probability of future persecution to prevail on a withholding-of-removal claim and a showing of likelihood of torture for relief under the CAT).

Accordingly, we DENY the petition for review.