# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2939

RASHED AWADH KARAMA BINRASHED,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A75-678-575

ARGUED FEBRUARY 9, 2007—DECIDED SEPTEMBER 14, 2007

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Rashed Awadh Karama BinRashed ("BinRashed"), a Yemeni national, entered the United States as a nonimmigrant visitor for pleasure in 1999. The following year, he received asylum by fraudulently representing himself to be a citizen of Somalia. In 2005, after his conviction on misdemeanor charges of obstructing an officer, BinRashed was placed in removal proceedings. The immigration judge denied BinRashed's requests for withholding of removal under the Immigration and Nationality Act and the United Nations Convention Against Torture, concluding that BinRashed had not suffered past persecution or established a clear

probability of future persecution. In a brief opinion, the Bureau of Immigration Appeals affirmed. Because the agency neglected critical evidence in the record, we grant the petition for review, vacate the agency's decision, and remand for further proceedings.

## I. BACKGROUND

In May 2005, BinRashed was pulled over for driving a car with a broken taillight. The detaining officer recognized BinRashed from an earlier traffic stop and noted that BinRashed had used a different name during the prior stop. After searching BinRashed's car, the officer discovered several identification documents and arrested BinRashed for obstructing an officer. Documents seized from BinRashed's car led to the discovery of his grant of asylum under a claim of Somali citizenship.

While BinRashed's obstruction case was pending in state court, the Federal Bureau of Investigation began an investigation of BinRashed's identity, and the Department of Homeland Security took him into custody. Following his state court conviction, BinRashed was placed in removal proceedings under two theories of removability: remaining in the United States beyond the authorized period, *see* 8 U.S.C. § 1227(a)(1)(B), and failing to comply with the Attorney General's registration requirements, *see* 8 U.S.C. § 1227(a)(3)(A). Later, DHS added Bin-Rashed's procurement of asylum by fraud as an additional basis for removal, *see* 8 U.S.C. § 1227(a)(1)(A). Although BinRashed denied having remained in the United States for longer than authorized, he conceded removability on the other two bases and requested withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT").

BinRashed offered the following evidence in support of his withholding requests. BinRashed was born in Yemen

on June 25, 1980. During BinRashed's youth, his father, Awadh Karama Rashed ("Rashed"), was an active member of the Yemeni Socialist Party and frequently represented the government abroad. When civil war broke out between North and South Yemen in 1994, Rashed was working with the South Yemeni government in its campaign to secede from North Yemen. The hopes of South Yemen were dashed when the North defeated the South a few months after the outbreak of war.

After the war, BinRashed's life, and that of his family, changed for the worse. On one occasion, BinRashed's family was stopped by government officials at a security checkpoint while driving to North Yemen. BinRashed's family hoped to visit relatives, who, as a result of a disruption in communication channels, would not otherwise know they were safe. During their detention, armed officers took them to see the city's "senior man," searched them, and confiscated their registration documents. Although the officers said the women and children were free to leave, the family refused to be separated and remained in custody until friends could negotiate their release. At the end of the encounter, which lasted a few hours, the officials returned the family's belongings and permitted them to leave.

BinRashed offered examples of other indignities of varying severity. A week after the war's end, officers attempted to confiscate Rashed's car as government property, but he successfully resisted. The government tapped the family's phone, and BinRashed and his father were frequently pulled over when driving Rashed's car. Further, although Rashed was nominally permitted to continue working for the government, he was stripped of his diplomatic responsibilities and much of his pay. The government also questioned Rashed about his connections and his source of income and asked Rashed's friend to report on Rashed.

In 1995, Rashed responded to the government's actions by increasing his involvement in the movement for equal rights for southerners. He assisted in founding civilian organizations that resisted discrimination and participated in a protest following the rape of two girls by northern soldiers. A leader in the movement was severely beaten for his role in the civilian organizations, and BinRashed's family experienced more severe harassment in the years following Rashed's enhanced activism. In 1998, government officials broke into an apartment that the family used a few times a year when visiting relatives in the northern half of the country. When the family returned to that apartment, their neighbors informed them that officers had entered the apartment seeking to arrest Rashed and to confiscate the apartment. The next day, armed officers arrived at the apartment to arrest Rashed; however, only BinRashed, his mother, and his sister were present. The officers then threatened to arrest BinRashed in his father's place, but his mother convinced the officers to await Rashed's return. When Rashed returned, he and an attorney went to police headquarters, where they convinced the police not to arrest Rashed or to confiscate his apartment. The government ultimately confiscated the apartment in 1999, paying Rashed only a small sum of money in compensation. That same year, BinRashed decided to leave for the United States.

Leaving the country, however, was not without difficulty. Although BinRashed offered documentation of his citizenship when applying for a passport, a government official doubted BinRashed's citizenship because of his darker skin and long hair. After a verbal altercation, the official arrested BinRashed and detained him in a locked, poorly ventilated, dusty room without electricity or water. While escorting BinRashed to the room, the officers threatened to cut his hair and verbally abused him. Petitioner remained in custody for three hours, until his father heard

of his detention and convinced the officials to release him. BinRashed left Yemen and traveled to Atlanta, Georgia in 1999. Upon relocating to California, Somali friends told BinRashed to apply for asylum as a Somali because the asylum applications of Yemenis were routinely being denied. BinRashed followed their advice and obtained asylum as a Somali citizen. He eventually moved to Wisconsin, where he was arrested in 2005.

After BinRashed left Yemen, his family continued to be harassed and threatened by the Yemeni government. According to Rashed, who testified by phone, in May 2000, officers interrogated him at his home about his political activities. Again, in March 2001, the government detained Rashed and his colleagues for four hours during their trip to investigate claims of abuse by security services against southerners. That September, police forced their way into Rashed's car, refusing to release his daughter who was with him at the time, and subsequently detained him for three hours. After his release, a regional head of political security contacted Rashed and threatened that if he did not discontinue his opposition activities, something he would neither "imagine or expect" would happen to him or his family. Rashed then decided that he and his family should leave the country, and they left Yemen in 2002 for the United Kingdom, where they obtained asylum. After arriving in the U.K., Rashed helped found the Southern Democratic Assembly ("TAJ"), an international organization that seeks independence for South Yemen and secession from the North. Rashed is an officer in the organization, and his name and picture are displayed on the organization's website.

At his hearing, BinRashed also offered expert testimony from Munir Mawari, a native of Yemen and journalist who reports on human rights and democracy in the Middle East. Based on his knowledge of Yemen and his review of BinRashed's case, Mawari testified that

BinRashed would more likely than not be harmed or even killed if returned to Yemen. Mawari believed BinRashed would suffer this fate due to his South Yemeni heritage, his father's political activities, his prior claim of Somali citizenship, and dangerous conditions in Yemen.

BinRashed also submitted documentary evidence in support of his requests. A letter from the chairman of Yemeni Human Rights Watch indicated that as of June 2005, BinRashed, his father, mother, and sister were all wanted by the Yemeni government, and that their names and pictures were circulated in all ports of the country. Additionally, BinRashed proffered U.S. State Department Country Reports for Yemen for 2004 and 2005 and various articles regarding abuses against journalists in Yemen.

In his oral decision, the IJ found BinRashed removable on all of the charged grounds and denied his requests for withholding of removal under the INA and CAT. In denying relief, the IJ noted that in 2004 and 2005, the State Department received no reports of politically motivated disappearances or killings and that Yemen detained few political prisoners. The IJ dismissed the majority of BinRashed's other documentation as relating to civil unrest in North Yemen and the treatment of journalists.

Further, the IJ found the testimony of Munir Mawari unpersuasive, commenting that Mawari often referred to BinRashed's past and threatened treatment as mere "harassment" and reported on general conditions of civil strife within Yemen. The IJ declared that aside from Mawari's and BinRashed's testimony there was "absolutely no independent corroborative evidence to buttress their position that someone who is considered the son of someone who is adverse to the government would be persecuted in his father's stead." He likewise found "absolutely no independent evidence relating to the government having

any interest in [BinRashed's] father" and "no independent evidence other than what [BinRashed] states that his father's activities would cause [BinRashed] difficulty today." After remarking that the U.K.'s grant of asylum to BinRashed's family had no bearing on his entitlement to withholding in the U.S., the IJ denied BinRashed's requests for relief and ordered BinRashed's removal to the U.K., or alternatively, Yemen.

BinRashed appealed to the Board of Immigration Appeals. In a brief opinion, the BIA rejected BinRashed's contention that the IJ had given a selective recitation of the evidence. The BIA noted that because some of the articles that BinRashed supplied in support of his case were several years old, they were poor indicators of present conditions in Yemen. The BIA found other articles irrelevant in that they described life for journalists, who because of their unique role in exposing political corruption could not be compared to BinRashed. The BIA found that the IJ's conclusions as to the remaining evidence were not clearly erroneous and dismissed the appeal. BinRashed now petitions this court for review.

## II. ANALYSIS

### A. Standard of Review

When the BIA adopts and supplements the IJ's reasoning, we review the IJ's decision as supplemented by the BIA. *See Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). We will uphold the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.*; *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005). "Although our review of the agency determination is highly deferential and we may not reverse merely because we might have decided the case differently, we will not automatically

yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005) (internal citations and quotation marks omitted).

## B. Relief under the Immigration and Nationality Act

BinRashed challenges the agency's denial of his request for withholding of removal under the INA, which prohibits the removal of a person to a country where his "life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). BinRashed contends that while living in Yemen he suffered persecution on account of his father's political views and that if returned to Yemen he will suffer persecution or torture in light of his father's recently enhanced and conspicuous political activism. His assertions may be analyzed as claims of persecution on account of imputed political opinion or membership in a particular social group. *Cf. Mema v. Gonzales*, 474 F.3d 412, 416-17 (7th Cir. 2007) ("[A]sylum is available to persons who have been persecuted based on imputed political opinion, including situations where a persecutor attributes the political opinion of one or more family members to the asylum applicant. . . . Sometimes this situation is described as persecution based on membership in a social group—i.e. the family group—but in either case the necessary proof is the same." (emphasis omitted)); *Iliev v. INS*, 127 F.3d 638, 642 n.4 (7th Cir. 1997) (treating petitioner's family as social group). In addition to establishing the motive underscoring his mistreatment, an applicant for withholding of removal must also demonstrate a clear probability of harm—i.e., that persecution is more likely than not. *Firmansjah v. Gonzales*, 424 F.3d 598, 605

(7th Cir. 2005). Indeed, "[t]he INA does not require withholding if an applicant simply 'might or could be subject to persecution.'" *Mabasa v. Gonzales*, 455 F.3d 740, 745 (7th Cir. 2006) (quoting *INS v. Stevic*, 467 U.S. 407, 422 (1984)).

There are two methods by which an applicant can establish that it is more likely than not that his life or freedom will be threatened. "[I]f an applicant demonstrates that she suffered past persecution in the proposed country of removal, 'it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim.'" *Firmansjah*, 424 F.3d at 605 (quoting 8 C.F.R. § 1208.16(b)(1)). The government may rebut this presumption by showing a fundamental change in country conditions or that the applicant can safely and reasonably relocate within the country to avoid persecution. *Id.*; 8 C.F.R. § 1208.16(b)(1)(i). In the absence of evidence of past persecution, an applicant may meet his burden by offering evidence of a clear probability of suffering future persecution if removed. *Firmansjah*, 424 F.3d at 606; 8 C.F.R. § 1208.16(b)(2) ("An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country."). We address BinRashed's claim under both methods of proof.

### 1. Past Persecution

BinRashed contends that he is entitled to a presumption of future persecution because he was previously subjected to detention, arrest, interrogation, illegal search, confisca-

tion of property, and surveillance at the hands of the Yemeni government. The IJ accepted these allegations as true, but concluded that they did not rise to the level of persecution. We conclude that the IJ's finding is supported by substantial evidence.

At the outset, we observe that many of the acts detailed above were directed at BinRashed's father, not BinRashed. But the focus of our inquiry must be whether BinRashed personally suffered persecution. *See Mabasa*, 455 F.3d at 746. Although the whole family was detained just after the civil war while en route to visit relatives in the north, the officials told the women and children (which presumably included BinRashed who was then 13 or 14 years of age) that they were free to go, but the women and children declined to leave out of concern for the men. BinRashed attributed his only other detention, of less than three hours, to the length of his hair and skin color, not to his father's political opinion. But even if that detention were on account of a protected ground, it did not rise to the level of persecution because it was brief and did not result in physical harm. *See Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007) ("[S]hort detentions or detentions without physical abuse seem to have been less apt to reach the 'persecution' threshold required by this court." (quoting *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004)); *Bejko v. Gonzales*, 468 F.3d 482, 485 (7th Cir. 2006) (finding that an applicant's two-week detention during which he received minimal food and water did not compel a finding of past persecution); *Dandan v. Ashcroft*, 339 F.3d 567, 574 (7th Cir. 2003) (finding that a three-day detention involving interrogations, deprivation of food, and beatings did not compel a finding of past persecution).

Additionally, although Rashed was arrested and interrogated on several occasions, BinRashed cannot claim similar treatment. Officials threatened to arrest him on

one occasion, in Rashed's place, but did not carry out that threat. Of course, we must consider all the mistreatment BinRashed suffered as a whole, *see Bejko*, 468 F.3d at 486, but even in doing so, we do not find the other mistreatment sufficient to compel a finding of persecution. The IJ was permitted to conclude that the other indignities BinRashed suffered at the hands of the Yemeni government—the taking of his family's second home for minimal compensation, unprovoked traffic stops, the wiretapping of the family's phone—were more in the nature of harassment than persecution. Accordingly, we affirm the agency's conclusion that BinRashed did not suffer past persecution.

### 2. Future Persecution

We next turn to BinRashed's arguments regarding his claim of future persecution. Although many of BinRashed's attacks on the IJ's reasoning are too trivial to merit discussion, we agree with BinRashed's view that the IJ and BIA failed to discuss critical record evidence, which bore upon his entitlement to withholding of removal.

In particular, we are troubled by three key conclusions in the IJ's opinion, which suggest that the IJ overlooked key pieces of evidence: (1) a conclusion that aside from Mawari's and BinRashed's testimony there was "absolutely no independent corroborative evidence" that the son of a person adverse to the government might be persecuted in his father's stead; (2) a finding of "absolutely no independent evidence relating to the government having any interest in [BinRashed's] father"; and (3) a determination that there was "no independent evidence other than what [BinRashed] states that his father's activities would cause [BinRashed] difficulty today." These conclusions figured heavily in the IJ's assessment of Mawari's testimony, and in the ultimate conclusion that, despite

Mawari's expert opinion, BinRashed would not be likely to face persecution if removed.

BinRashed notes that, contrary to the IJ's assertion, there was independent evidence that BinRashed, as a son of a person adverse to the government, might be persecuted in his father's place. We know that before BinRashed left the country, on one occasion, officials threatened to arrest him when his father could not be found. Such prior unfulfilled threats may be indicators of future persecution. *Bejko*, 468 F.3d at 486 ("'[U]nfulfilled threats will fall within that category of past experience more properly viewed as indicative of the danger of future persecution.'" (quoting *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997)). Corroborating evidence can also be found in the country condition reports. The 2004 report provided that, "[i]n some cases where a criminal suspect was at large, security forces detained a relative while the suspect was being sought. Detention of the family member continued while the concerned families negotiated compensation for the alleged wrongdoing." Again, the State Department observed that in 2005, "police forces routinely detained relatives of suspects while the suspect was being sought . . . . According to HOOD [National Organization for Defending Rights and Freedoms], over 100 such cases were reported throughout the country during the year." But, the IJ and BIA failed to even acknowledge this evidence.

Likewise, the IJ and BIA disregarded evidence that Rashed is currently wanted by the government and that his present political involvements would cause his son difficulty today. Specifically, the Chairman of Yemeni Human Rights Watch submitted a letter confirming that Rashed and his family are wanted by the government: "[W]e have obtained credible information from our own secret resources in Yemen stating that the Yemeni Authorities have listed the names of [the leaders of the Southern

Democratic Assembly] as wanted by the political security forces, and these include Rashed and his family, including his wife, daughter, and his son Rashed. The names and pictures are circulated in all ports of the country." The Chairman closed by stating that BinRashed's "return to Yemen is a very big risk to his life." This letter, of undisputed authenticity, provides specific and credible evidence that the Yemeni government is interested in learning Rashed's and BinRashed's whereabouts and that they could not reenter the country undetected. *See Adekpe v. Gonzales,* 480 F.3d 525, 532-33 (7th Cir. 2007) (noting that letters sent to asylum applicant from family members stating that government had inquired into applicant's whereabouts bolstered applicant's claim of past persecution).

The letter, coupled with BinRashed's threatened arrest and the State Department's finding that family members of criminal suspects are detained in their stead, provide evidence that BinRashed would be identified and detained upon return to Yemen, at least until his father could be located. And, given that his father is presently safely residing in the U.K., BinRashed could not depend on his father's quick return to Yemen to effectuate his release. This evidence suggests to us a colorable basis for concluding that BinRashed's "freedom" would be compromised upon return to Yemen, a condition that may mandate withholding of removal. But, inexplicably, neither the IJ nor BIA addressed the implications of BinRashed's prior threatened arrest, the reports on the treatment of the relatives of persons wanted by the police, or the letter from Yemeni Human Rights Watch. Failing to do so was error. *See Agbor v. Gonzales*, 487 F.3d 499, 504 (7th Cir. 2007) ("The BIA ignored this evidence, and that is something it is not permitted to do."); *Mema*, 474 F.3d at 419 ("An applicant for asylum is entitled to a reasoned analysis, not one which wholly disregards relevant, probative evid-

ence."); *Diallo*, 381 F.3d at 695 ("An immigration judge may not simply ignore record evidence that favors the applicant's case."). In addition, given the IJ's view of Mawari's testimony as uncorroborated and based on "naked speculation," the letter and evidence in the country reports might have recast Mawari's testimony in a more favorable light, potentially altering the whole complexion of BinRashed's case.

Because the agency disregarded critical and probative evidence in support of BinRashed's claims, we find that the IJ's and BIA's decisions are not supported by substantial evidence. *See Agbor*, 487 F.3d at 504 ("[T]he BIA's decision is not supported by substantial evidence and must be vacated. The BIA disregarded key evidence that is specific to the petitioners' case, relied on background evidence that is only generally to the contrary, and then faulted the petitioners for failing to offer specific evidence overcoming the background evidence."); *Gjerazi*, 435 F.3d at 813 ("Gjerazi is entitled to a well-reasoned, documented, and complete analysis that engages the evidence he presented, particularly the ample evidence demonstrating a political motivation for his persecution. The IJ's decision falls far short of this standard, and we hold that his conclusions are not supported by substantial evidence in the record."). We therefore vacate the BIA's denial of BinRashed's request for withholding of removal under the INA. In doing so, we offer no opinion as to the ultimate merit of BinRashed's claims and leave it to the agency to address the overlooked evidence in the first instance. *See Durgac v. Gonzales*, 430 F.3d 849, 851-52 (7th Cir. 2005) ("[P]etitions for review will be granted when the court concludes that there is more that must be done at the agency level before a final conclusion on an asylum application is possible."); *Niam v. Ashcroft*, 354 F.3d 652, 656 (7th Cir. 2004) ("Is the probability of persecution 'clear'? That is for the immigration authorities to decide

in the first instance in a proceeding free from the errors of the immigration judge that, taken as a whole, deprive the order of removal of a rational basis. The order must be vacated and the case returned to the immigration service for further proceedings consistent with this opinion.").

## C. Protection under the Convention Against Torture

The IJ also denied BinRashed's request for protection under the CAT, which affords relief from removal where an applicant establishes that it is more likely than not that he will be tortured upon his removal to the proposed country. *Rashiah v. Ashcroft*, 388 F.3d 1126, 1131 (7th Cir. 2004) (citing 8 C.F.R. § 208.16(c)(2)). Based on our finding that the IJ and BIA failed to address critical evidence in the record regarding the type of treatment that BinRashed might face upon removal, we remand on this claim as well. *See Lian v. Ashcroft*, 379 F.3d 457, 461 (7th Cir. 2004) (providing that the IJ, not the reviewing court, must determine "in the first instance" whether evidence in the record that was previously ignored supports a conclusion that the petitioner would more likely than not be tortured upon removal).

## III. CONCLUSION

For the foregoing reasons, we GRANT BinRashed's petition for review, VACATE the decision of the BIA, and REMAND for proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*