In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2406

SIMON P. IRASOC,

*Petitioner-Appellant,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent-Appellee.*

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97 452 638

———————

ARGUED MARCH 4, 2008—DECIDED APRIL 3, 2008

———————

Before CUDAHY, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After the Department of Homeland Security (DHS) initiated removal proceedings against Simon Irasoc in 2004, he applied for asylum based on the religious persecution he suffered as a member of the Pentecostal Church in Romania. He also sought withholding of removal and protection under the Convention Against Torture (CAT). The Immigration Judge (IJ) denied his applications, and the Board of Immigration Appeals (BIA) affirmed. Irasoc now petitions for review.

Irasoc, a 24-year-old native and citizen of Romania, fled to the United States in November 2002. In April 2004, the

DHS served him with a Notice to Appear, charging removability because he lacked legal status. Irasoc admitted removability but applied for asylum, withholding of removal, and protection under CAT. In his application and at his hearing, Irasoc recounted the following events, which (importantly) the IJ deemed credible. So on this record, the following facts are undisputed.

Irasoc and his parents have been active members of the Pentecostal Church, a minority religion in Romania, for many years. Because they were church members, the police arrested them several times and confiscated their bibles. Following the downfall of Romania's communist regime, however, Irasoc and his family were able to attend church at least three times a week. Irasoc himself had become an a itinerant missionary in Romania, proselytizing throughout the country, by his own count nearly 500 times. But even in post-communist Romania, he continued to experience "considerable resentment" from local police.

The incident at the crux of Irasoc's claim of persecution occurred in July 2002, when several police officers confronted him as he preached to a gathering group of people. The officers ordered Irasoc to stop preaching and leave town, but before he could do so they began striking him with their batons. They then arrested him, put him in handcuffs, and took him to a police interrogation room where the beatings continued. There, the local police inspector derided him for supporting the Pentecostal Church and slapped him while other officers watched. Once the interrogation stopped, the officers began forcefully kicking Irasoc in the testicles, where the intense pain caused him to collapse to the floor unconscious. When Irasoc awoke, he discovered that he had been

left alone in a prison cell. Before releasing him the next day, the officers beat Irasoc again, warning him that interrogations and beatings would continue if he did not leave the area. Upon leaving the station, Irasoc met his father, who also appeared to have been beaten.

Within two weeks of the incident, Irasoc's father received renewed threats from the police, telling him that his son should leave the country. Heeding the threats, Irasoc left Romania and subsequently arranged to be smuggled into the United States in a shipping container. He arrived here in either November or December of 2002.

Irasoc testified at the removal hearing that, as a result of the July 2002 incident, he feared imprisonment if he returned to Romania, though he wasn't sure what else the police would do. He also stated that he would continue to openly practice his religion.

After the hearing, the IJ denied Irasoc's asylum application because it was time-barred for having been filed more than one year after his entry into the United States. The IJ also held that Irasoc failed to meet his burden of proof with respect to withholding of removal. He reasoned that Irasoc had openly practiced his religion for most of his adult life and proselytized throughout Romania without "great difficulty." Further, he said that religious freedom has "flourished" in Romania since the overthrow of the Communist government; the Romanian Pentecostal Church itself has over 30,000 members. The IJ concluded that the July 2002 incident was not past persecution because it was a single episode of mistreatment during which Irasoc was not "serious harmed." Separately, the IJ determined that Irasoc had failed to establish a "more likely than not" fear of future persecution. And, as to the CAT claim, the IJ found that Irasoc

offered no evidence that he was "more likely than not" to be tortured upon removal to Romania. The BIA affirmed the IJ's decision and dismissed Irasoc's appeal.

Irasoc's petition for review only concerns the denial of his application for withholding of removal. He argues that he not only established past persecution, but also a well-founded fear of future persecution were he to be returned to Romania. He does not challenge the IJ's denial of his claim for relief under CAT or the denial of his application for asylum.

Because the BIA adopted and affirmed the IJ's reasoning, we review the IJ's decision as supplemented by the BIA. *See Binrashed v. Gonzales*, 502 F.3d 666, 670 (7th Cir. 2007). We review the agency's determination under a highly deferential standard—we will uphold the decision so long as it is supported by substantial evidence, and will not reverse unless the BIA made an error of law, *e.g.*, *Asani v. INS*, 154 F.3d 719, 722-23 (7th Cir. 1998), or the record compels a contrary result, *e.g.*, *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007); *Binrashed*, 502 F.3d at 670; *Dandan v. Ashcroft*, 339 F.3d 567, 572 (7th Cir. 2003).

To establish eligibility for withholding of removal, an applicant must show a "clear probability" of persecution on account of his religion, race, or nationality. 8 U.S.C. § 1231(b)(3)(A); *Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007). The applicant must demonstrate either that he suffered past persecution (which creates a presumption of future persecution) or, in the absence of such evidence, that it is more likely than not that he would face future persecution in the country to which he would be returned. *Binrashed*, 502 F.3d at 670-71; *Tariq*, 505 F.3d at 656-57. If the applicant demonstrates past persecution,

the burden shifts to the government to rebut the presumption that the applicant would endure future persecution if removed. *Binrashed*, 502 F.3d at 670-71.

Here, the IJ applied an incorrect legal standard in determining that Irasoc did not suffer past persecution from the genital beatings. In particular, the IJ found that Irasoc had failed to establish that he was "seriously harmed." Yet we have reversed the BIA for requiring that a petitioner suffer "serious injuries" as a prerequisite to a finding of past persecution. *Asani*, 154 F.3d at 722-24. We have, instead, held that past persecution is defined only as "punishment" or "the infliction of harm" administered on account of nationality, religion, race, group membership, or political opinion. *Id.* at 723, 724. And we have, on multiple occasions, determined that past persecution "need not necessarily threaten the petitioner's life or freedom." *Id.* at 723; *see Tarraf v. Gonzales*, 495 F.3d 525, 534-35 (7th Cir. 2007) ("Physical abuse causing serious injuries is not the sine qua non of persecution.").

In determining whether an incident constitutes past persecution, we do not simply evaluate the applicant's claim "against a generic checklist." *Tarraf*, 495 F.3d at 535. While the frequency and intensity of the episode(s) are variables in the analysis, even a single incident can reflect past persecution as long as the specifics reveal the severity of the particular situation. *Id.*; *Zhu v. Gonzales*, 465 F.3d 316, 319 (7th Cir. 2006) (injury must be considered alongside specific details of incident); *Dandan*, 339 F.3d at 573 (number of times applicant subjected to detention or abuse, and details of abuse, is relevant to analysis of claim). In *Asani*, we held that the BIA wrongly concluded that a single day of police beatings, leading

to two lost teeth and preceded by an earlier two-week detention, was not past persecution. *Asani*, 154 F.3d at 723-25. Five years later in *Dandan*, though, we determined that a three-day detention involving unspecified beatings that produced a swollen face did not amount to past persecution. *Dandan*, 339 F.3d at 573-75. We grounded that decision on the applicant's inability to describe the specific facts of his detention. *Id.* at 574. Finally, in *Zhu*, we held that an incident involving a cut requiring seven stitches, unaccompanied by detention or any other exacerbating factor, did not constitute past persecution. *Zhu*, 465 F.3d at 319-20.

The beatings inflicted upon Irasoc by the police while he was cuffed in a jail cell over two days, rendering him unconscious from the pain to his groin, most closely resemble *Asani*, where the applicant lost two teeth during a one-day beating that had followed an earlier, two-week detention. *Cf. Asani*, 154 F.3d at 723-25. And in contrast with the petitioner in *Dandan*, Irasoc has attested to detailed facts of his beatings, the veracity of which is not questioned, revealing the severity of the July 2002 incident. *Cf. Dandan*, 339 F.3d at 575. Also, unlike the applicant in *Zhu*, Irasoc endured multiple beatings and was in fact jailed. *Cf. Zhu*, 465 F.3d at 319-20. While it is true that Irasoc did not suffer permanent injuries, as in *Asani* the IJ here employed an incorrect legal standard precisely because he required a showing of "serious injuries." Accordingly, Irasoc has established past persecution, and his petition for review, to that extent, is granted.

Finally, we note that on remand the government will have the opportunity to rebut the presumption that Irasoc will endure future persecution if returned to Romania. *See*

*Binrashed*, 502 F.3d at 670-71. A 2004 State Department Report on Human Rights Practices in Romania, for instance, states that although some harassment remains at the local level, religious freedom in Romania has been improving. Recent opinions by this court have also recognized the improving conditions in post-communist Romania. *See, e.g., Simtion v. Ashcroft*, 393 F.3d 733 (7th Cir. 2004). It may therefore be possible on remand for the government to rebut a presumption of future persecution. But the issue has not yet been fully litigated and therefore a remand is appropriate.

Accordingly, we GRANT the petition for review and REMAND for further proceedings consistent with this opinion.