**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 11, 2008
Decided July 1, 2008

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-2722

| | |
|---|---|
| UBAIDULLAH SYED, | Petition for Review of an Order of the |
| *Petitioner*, | Board of Immigration Appeals. |
| | |
| *v.* | No. A96 420 630 |
| | |
| MICHAEL B. MUKASEY, Attorney | |
| General of the United States, | |
| *Respondent*. | |

**O R D E R**

After fleeing from an arranged marriage in Hyderabad, India, Ubaidullah Syed sought withholding of removal and protection under the Convention Against Torture. An immigration judge denied the requested relief, though, because Syed could not show that, upon removal, his life or freedom would more likely than not be threatened on account of any protected ground. The Board of Immigration Appeals affirmed the decision and dismissed Syed's appeal. Syed now petitions for review. Because Syed has not demonstrated past persecution or a clear probability of future persecution upon return to India, we deny the petition for review.

## Background

For most of his life, Syed was an adherent of Mahdavia, an Islamic sect found throughout India. As the son of a top cleric, he was expected to enter into an arranged marriage orchestrated by Mahdavia elders in his hometown of Hyderabad. But in 1995, on the eve of his wedding, he asked if he could meet his future wife, Sabiha Banu, and speak with her before their union. The elders refused the request, and Syed responded with a threat to boycott the wedding unless he could meet his bride beforehand. Syed capitulated, however, after the elders threatened him with exile. But the ensuing marriage was not a happy one. Syed was not attracted to Banu, and their sexual life was hampered by a medical problem that caused Banu great pain during sexual relations.

In March 1996 Syed left Hyderabad for Chennai, leaving behind his wife and newborn son. Within a week of his departure, one of Syed's in-laws found him and demanded that he return to his family in Hyderabad. Syed reports, "I refused, but the man . . . began to punch and push me and told me that I had better do so, or he was going to seriously hurt me." Syed appealed to the Chennai police for assistance but was told that "this is your domestic problem" and that there would be no police intervention unless "you got some blood coming out from your body, then, only we make a case." Fearing further violence, Syed returned to Hyderabad. Over the next four years, he fled to Bangalore, Mumbai, and Calcutta—and each time he was forced to return to Hyderabad under similar circumstances. Upon his return, Mahdavis would "threaten [him] with violence, and even death, if [he] were to attempt to leave [his] wife again." Finally, in 2000, Syed ran away to New Delhi, where he evaded detection by "hiding" and "liv[ing] in huts" for five months until departing the country.

Syed entered the United States illegally on August 15, 2000. Some time later he was arrested at a bus station in Detroit, Michigan. While living in the United States, Syed obtained a divorce and converted from Mahdavia to Sunni Muslim, "whose religious laws on divorce are," according to Syed, "more reasonable and . . . the clerics are not involved in the decision process of marriage or divorce." Meanwhile, Syed's parents sought a divorce on his behalf (one that the Mahdavi community would recognize) from the elders in Hyderabad. The elders denied the request, however, and insisted that it was Syed's "fate" to remain wedded to Banu. Shortly thereafter, a group of Syed's in-laws threatened his parents and demanded that they reveal his whereabouts. They "began to hit and push . . . around" Syed's father, who has health problems, and "he required hospital attention after this." The record does not, however, provide any further detail regarding Syed's father's medical treatment.

Following this incident Syed's parents complained to the Hyderabad police, but the local inspector demanded a sizable bribe to protect them from harassment. Even after Syed's parents paid the bribe, the police refused to intervene and "generally responded that unless someone has been killed, they are not concerned." The record contains other evidence of requests for governmental assistance, including (1) an undated letter from Syed to the president of the Hyderabad Human and Civil Rights Forum requesting protection for his parents, who are "elderly, weak and sensitive" and "not in [a] position to handle . . . gangsters or rowdies"; (2) an order from the High Court of Judicature denying "anticipatory bail" to Syed's parents because no crime has been alleged and "the police are not expected to arrest the petitioners without registering a crime"; and (3) an illegible police complaint filed with the Hyderabad City Police.

In February 2006 Syed sought withholding of removal and relief under the Convention Against Torture (CAT), arguing that he had suffered past persecution for attempting to divorce his wife and that he feared future persecution because of his divorce in the United States and his conversion from Mahdavia to Sunni. The immigration judge (IJ) denied the applications on numerous grounds. First, the IJ determined that Syed's opposition to arranged marriage was not a religious conviction but rather a personal preference for a different wife. According to the IJ, Syed was "unwilling[] to remain married to Ms. Banu [because] he simply did not find her attractive and believed that she came to the marriage with a medical problem." The IJ found support for this conclusion in Syed's own statements that he did not, at the outset, disagree with the institution of arranged marriage and that "had his wife been a different person, he may have remained married to her." Moreover, the IJ noted, Sunnis also practice arranged marriage. Second, contrary to Syed's assertions, "law enforcement authorities in India have taken some action" to protect him and his parents. And, finally, the IJ held that Syed's own account of his time in New Delhi confirmed that he could relocate safely within India, "a huge country with a population that is greater than the United States."

Syed's appeal to the Board of Immigration Appeals (BIA) was similarly unsuccessful. The BIA agreed with the IJ that Syed had not experienced persecution because "his claim evolved out of a personal disagreement" as opposed to a religious opposition to arranged marriage. The BIA also determined that Indian authorities had "taken action to protect his family." Furthermore, "the mistreatment perpetrated by his in-laws, consisting of little more than harassment and minor beatings, [does not] amount[] to persecution." And Syed's experience in New Delhi demonstrated that he could relocate safely elsewhere in India.

## Analysis

If the BIA issues its own opinion instead of supplementing or adopting the IJ's decision, we confine our review to the BIA's opinion. *Moab v. Gonzales*, 500 F.3d 656, 659

(7th Cir. 2007). And we will uphold the agency's decision so long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Moab*, 500 F.3d at 660.

Syed contests the denial of his application for withholding of removal under the Immigration and Nationality Act, which prevents removal if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).[1] An applicant can establish eligibility for withholding of removal by demonstrating past persecution, which creates a rebuttable presumption of future persecution, or by offering evidence of a clear probability ("more likely than not") of future persecution. *Irasoc v. Mukasey*, 522 F.3d 727, 729-30 (7th Cir. 2008); *BinRashed v. Gonzales*, 502 F.3d 666, 670-71 (7th Cir. 2007).

Syed's first argument on appeal is that the BIA erred by construing his claim merely as a religious objection to arranged marriage; according to Syed, his claim also encompasses a religious objection to the Mahdavi prohibition *on divorce*. Taken together, these practices constitute "[f]orced . . . marriage." This is a very fine—and ultimately fruitless—analytical distinction. The BIA evaluated Syed's claim of religious opposition to arranged marriage *and* explicitly addressed his desire "to end his marriage." Furthermore, the BIA appreciated Syed's contention "that he was forced to engage in an arranged marriage" from which he could not escape while living in India.

Syed's real disagreement lies with the BIA's conclusion that his claim evolved out of a personal disagreement. The record is replete with admissions by Syed that he would have been happy in a different arranged marriage. His marriage was lacking because he was not attracted to his wife and he was sexually disgruntled. Moreover, by his own account, Syed's religious opposition to forced marriage emerged only on the eve of his wedding. Still, Syed eventually sought a new religion that would give him "the choice." According to Syed, Sunnis can, prior to arranged marriage, "talk to [one's future spouse] . . . and you can go with her outside. And . . . you can have an engagement before marriage, and so that you can know each other well. If you don't like, you can cancel before marriage." Ultimately, however, Syed cannot show that his in-laws and the Mahdavia elders targeted him *for his religious beliefs*. To the contrary, Syed notes that his community was angered by the wasted expense of his wedding; the humiliation that his wife has suffered; and the dishonor that Syed has brought upon Mahdavia by his actions.

---

[1] Syed has waived his CAT claim by failing to address it in his opening brief before this court. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008).

Syed also contends that the harm he has alleged is severe enough to constitute past persecution.  He is wrong.  This court defines persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate."  *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2004) (quotation marks and citations omitted).  Persecution can take many forms, including physical abuse, economic deprivation, detention, arrest, interrogation, prosecution, imprisonment, illegal searches, surveillance, and torture.  *Irasoc*, 522 F.3d at 730; *Tarraf v. Gonzales*, 495 F.3d 525, 534-35 (7th Cir. 2007).  While there is no "generic checklist" of bad acts amounting to persecution, we consider the frequency and severity of the harm inflicted.  *Liu v. Ashcroft*, 380 F.3d 307, 313 (7th Cir. 2004); *see Irasoc*, 522 F.3d at 730.  Even a single event of physical abuse can be persecution so long as the harm is great.  *Gomes v. Gonzales*, 473 F.3d 746, 754 (7th Cir. 2007) (defining persecution to include a single incident of "severe physical abuse and terrorism inside his home, when his curtains were set on fire as Muslim fundamentalists held a knife to his throat and confiscated his property"); *Zhu v. Gonzales*, 465 F.3d 316, 319-20 (7th Cir. 2006) (concluding that a beating that required seven stitches was not alone enough to constitute persecution).  Unfulfilled threats, however, almost never rise to the level of persecution.  *See Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006) ("Threats can constitute past persecution only in the most extreme circumstances, such as where they are of a most immediate or menacing nature or if the perpetrators attempt to follow through on the threat.").  *But see Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) ("A credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution.").

The record reflects that Syed and his parents received threats of violence, but those threats materialized only twice—first in Chennai, when Syed was "punch[ed] and push[ed]" and then again when Syed's in-laws "physically abused" his father.  Any report of state-sanctioned violence is troubling, but Syed has provided little detail about these two encounters.  Without more information, these incidents are not severe or frequent enough to satisfy the stringent requirements of withholding of removal.  *See Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007).  Additionally, there are reasons for the IJ to have doubted the credibility of the Mahdavis' threats.  Syed reports that each time he returned to Hyderabad he was told that he would be killed if he left his wife again.  Yet Syed kept leaving—which provoked only further threats and harassment.  Furthermore, Syed's fear of death upon return is inconsistent with the Mahdavis' demand that he "accept [his] wife and child" and *live* with them.  Finally, Syed insists that he will be tortured if removed, but his fear of torture is based only on a single report that if he returns, "the main cleric from Hyderabad . . . want[s] me to be turned over to him."  This is too speculative to constitute persecution.

Also unavailing is Syed's argument that the BIA failed to address adequately whether his conversion to Sunni makes future persecution more likely than not. The BIA's analysis on this point is light, but so too is the evidence upon which Syed relies. Syed offered the following conjecture at the hearing:

> They will harass me, because that's a big thing in my community that I cannot change my [sect]. . . . They might kill me, or I don't know what they are going to do with me. Because there are some cases before, like 50, 60 years before? When somebody change their religion, they killed their persons, and so we got a graveyard. . . . [M]y father told me that . . . there's the punishment they give.

Elsewhere Syed writes that the consequence of return would be torture, a forced renunciation of his Sunni faith, and a public announcement "that I have returned to the Mahdavia sect." Instead of pointing to specific evidence regarding the Mahdavis' treatment of converts, Syed compares his situation to that of a former Muslim who converted to Christianity and faced capital punishment if removed to Iran. This is no substitute for reliable information about Mahdavi practices. Because Syed failed to furnish any evidence other than his own suspicions, it was not unreasonable for the BIA to conclude that "the respondent has failed to show that he more likely than not would be persecuted upon return to India on account of his conversion from the Mahdavian sect of Islam to the Sunni sect."

Syed's inability to establish past persecution or a clear probability of future persecution dooms his appeal, as does his failure to connect any of his mistreatment to a protected ground. Although Syed may have meritorious arguments on several ancillary issues, we need not reach those arguments because they would not alter the ultimate outcome of this case. *See Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) ("[T]he doctrine of harmless error is applicable to judicial review of immigration decisions."). Substantial evidence supports the BIA's denial of withholding of removal. Accordingly, we DENY the petition.