# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-3666

ALI AIOUB,

*Petitioner-Appellant,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent-Appellee.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97 320 264

_____

ARGUED AUGUST 6, 2008—DECIDED AUGUST 29, 2008

_____

Before EASTERBROOK, *Chief Judge*, and KANNE and WOOD,
*Circuit Judges*.

KANNE, *Circuit Judge*. Ali Aioub, a native and citizen of
Bangladesh, was charged with removability for obtaining
permanent residency through marriage fraud, *see* 8 U.S.C.
§ 1227(a)(1)(G)(ii), and procuring admission to the
United States through fraud, *see id.* § 227(a)(1)(A). An
immigration judge found Aioub removable on account of
the marriage fraud, denied his application for asylum

partly because of that fraud, and denied his application for withholding of removal. The Board of Immigration Appeals adopted the IJ's decision, and Aioub now petitions for review. Because there is substantial evidence supporting the IJ's decision, we deny Aioub's petition.

Aioub entered the United States in June 2001 to attend college as a non-immigrant student. But he quit school in March 2003 and married Brandi Hillman, a United States citizen, that same month. In November 2004, the Department of Homeland Security served Aioub with a Notice to Appear, alleging that the marriage was fraudulent and that he committed fraud to gain entry into the United States. Aioub had been interviewed by a DHS agent and admitted that his marriage to Hillman was fraudulent, yet at the removal hearing he claimed that he had made that admission because at the time he was a "mental disaster." The IJ then continued the hearing so that the government could gather further proof that the marriage was fraudulent.

When the removal hearing resumed, DHS special agent James Webb testified that he first learned of the case when he was contacted by Melody Allie in November 2004. Allie was concerned about the legal ramifications for her son, Frankie DeVille, Jr., when she discovered that his fiancee—Hillman—already was married to Aioub. Agent Webb then interviewed Hillman and DeVille, both of whom confirmed the information provided by Allie. DeVille said that Aioub had agreed to pay the couple $15,000 to participate in the scheme, while Hillman stated that Aioub had given them, not money, but an apartment

and a vehicle. Based on this information, Agent Webb arrested Aioub and took a written statement, in which Aioub admitted that he had entered "into a fraudulent marriage with Brandi Hillman for the purpose of gaining permanent resident status in the United States."

The government then called Hillman, who testified that she and DeVille moved into Aioub's apartment with her daughter in February 2003. A month later she married Aioub in exchange for the use of his apartment and vehicle. During their nine months of cohabitation, Hillman never consummated the marriage with Aioub, slept in a separate bedroom with DeVille, and became pregnant with DeVille's child. When interviewed by Agent Webb, Hillman had signed a statement revoking the I-130 Immediate Relative Petition she had filed on Aioub's behalf. In that statement Hillman explained that she had "entered into a marriage with Ali Aioub for him to get an immigration benefit."

Next, Aioub testified that he decided to file for asylum in November 2004 when he was detained by DHS. He said that he feared returning to Bangladesh because he had converted from Islam to Christianity after talking to his fellow detainees. After he called his parents to share the news, Aioub said, his father told the local villagers and became the target of discriminatory "sanctions." According to Aioub, his father could not find tenants for his rental houses, and most of his crops were destroyed. Aioub testified that he fears retribution for his conversion if he returns home, including demands for money, vandalism, and possibly even assault.

Finally, Professor Kendall Stiles testified on Aioub's behalf about conditions in Bangladesh. He agreed with the U.S. State Department's International Religious Freedom Report that a Bangladeshi Christian could "absolutely" practice Christianity openly. And, according to Stiles, although some villages, including Aioub's, have a "phobia" toward non-Muslims, the official government policy is in reality "quite tolerant." Professor Stiles added, however, that conversion was a different matter, and that Aioub might experience a "harsh" reaction if he was to inform the local community of his conversion. Still, he conceded that other Bangladeshis would have no way of knowing that Aioub had converted to Christianity.

After the hearing, the IJ found Aioub removable for committing marriage fraud. The IJ noted that Hillman and Aioub had "no intentions of making a life together at the time they entered into the marriage." Next, the IJ held that Aioub's asylum application was not barred by the one-year filing deadline because his conversion constituted changed circumstances. The IJ concluded, though, that Aioub's "fraudulent marriage to obtain permanent residence status warrants a discretionary denial of his request for asylum." The IJ then found that Aioub had failed to meet his burden of proof with respect to withholding of removal. He reasoned that the danger Aioub faced if deported did not rise to "the level necessary to qualify for withholding of removal." The BIA adopted and affirmed the IJ's decision.

In his petition for review, Aioub first argues that the IJ erred in finding him removable for committing marriage

fraud. Where, as here, the BIA's opinion adopts and adds "very little" to the IJ's decision, we review the IJ's decision as supplemented by the BIA's "terse opinion." *Hamdan v. Mukasey*, 528 F.3d 986, 991 (7th Cir. 2008). To uphold the IJ's decision, we must determine that substantial evidence supports the IJ's factual finding that the marriage was a sham. *Haxhiu v. Mukasey*, 519 F.3d 685, 689-90 (7th Cir. 2008); *Fang Huang v. Mukasey*, 523 F.3d 640, 649 (6th Cir. 2008).

Aioub entered the United States in 2001 on a student visa. Rather than finish school, he married Hillman just two years later. Yet, at the time of the marriage, Hillman was engaged to DeVille. At the removal hearing she testified that, although she moved into Aioub's apartment, she never consummated the marriage, slept in a separate bedroom with DeVille and her daughter, and married Aioub only to assist him in obtaining immigration benefits. Further, Agent Webb testified that both Hillman and DeVille, in separate interviews, admitted that the arrangement had been made in exchange for money and access to Aioub's apartment and vehicle. There is therefore substantial evidence supporting the IJ's factual finding that Aioub's marriage to Hillman was fraudulent.

Aioub next argues that the IJ erred in denying his asylum application on the basis of his fraudulent marriage. He contends that the IJ's analysis ignored evidence that there was "more to the relationship than a simple business arrangement." The Immigration and Nationality Act gives the Attorney General the discretion to grant or deny asylum to an alien who qualifies as a refugee. *See* 8 U.S.C.

§ 1101(a)(42)(A), 1158(b)(1); *Alsagladi v. Gonzales*, 450 F.3d 700, 701 (7th Cir. 2006) ("Status as a victim of persecution makes an alien *eligible* for asylum but does not compel an exercise of discretion in his favor."). We review a discretionary denial of asylum for abuse of discretion. *Alsagladi*, 450 F.3d at 701; *Fessehaye v. Gonzales*, 414 F.3d 746, 751-52 (7th Cir. 2005).

After finding Aioub removable for marriage fraud, the IJ determined that his actions constituted "a significant negative factor in his case" and decided not to exercise discretion in his favor. In doing so, the IJ found that Aioub's sham marriage warranted a "discretionary denial of his request for asylum." The IJ noted that Aioub had dropped out of school and faced possible removal shortly before marrying Hillman. And Aioub himself at first admitted that his marriage was a sham. Whether or not Aioub's arrangement with Hillman constituted more than a "simple business arrangement" makes no difference. We have held that immigrants who "take the easy but dishonest path when a more honorable if more difficult one is open cannot insist on administrative lenity." *Alsagladi*, 450 F.3d at 702. Accordingly, the IJ did not abuse its discretion in denying Aioub's asylum application.

Finally, Aioub argues that the IJ erred in denying his claim for withholding of removal. To establish his eligibility for withholding of removal, Aioub had to show a "clear probability" of persecution on account of his religion. *See* 8 U.S.C. § 1231(b)(3)(A); *Irasoc v. Mukasey*, 522 F.3d 727, 729-30 (7th Cir. 2008). Because Aioub did not allege past persecution, he had to prove that it is more likely than not

that he will suffer future persecution in Bangladesh. *See Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007). To overturn the IJ's denial of withholding of removal, we must find that the evidence compels a contrary result. *Irasoc*, 522 F.3d at 729.

Here, Aioub did not establish a clear probability of future persecution on account of his conversion to Christianity. Until his conversion in November 2004, Aioub had intended to return to Bangladesh to live with his family. Even after his conversion to Christianity while in detention, Aioub's parents seemed unconcerned with his decision, telling him only that they would "respect his decision." And his father felt secure enough to tell the local mosque that his son had converted to Christianity. Although his parents experienced some discrimination, Aioub's own expert witness and the U.S. State Department's International Religious Freedom Report both noted that Bangladesh is a tolerant nation in which Christianity is "openly" practiced. Finally, Aioub himself admitted that he could relocate to the largest city in Bangladesh, find employment, and remain relatively anonymous. This last argument, like the others, is without merit.

The petition for review is DENIED.