**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 10, 2008
Decided October 3, 2008

**Before**

JOHN L. COFFEY, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 08-1510

| | |
|---|---|
| DATE AZANLE AHODIKPE,<br>　　*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| 　　*v.* | No. A97 585 487 |
| MICHAEL B. MUKASEY, Attorney<br>General of the United States,<br>　　*Respondent*. | |

**O R D E R**

Date Ahodikpe, a citizen of Togo, entered the United States on a student visa in 1999. Four years later he applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The immigration judge (IJ) denied the asylum application as untimely and denied the remaining applications after concluding that Ahodikpe had not suffered past persecution nor had he demonstrated a clear probability of future persecution, much less torture. The Board of Immigration Appeals (BIA) upheld that decision. Ahodikpe now petitions for review, arguing that, contrary to the IJ's findings, he suffered past persecution and, furthermore, he was entitled to greater consideration of his CAT claim. But Ahodikpe's admittedly harsh treatment did not amount to persecution.

And the IJ properly addressed the question of torture; Ahodikpe's CAT claim was not supported by the record and thus did not warrant the exhaustive treatment that Ahodikpe feels he deserved.  For these reasons, we deny the petition for review.

## Background

Ahodikpe traces his political activism to 1992, beginning with an incident in which Togolese soldiers entered his school without warning and beat various students for their involvement in recent protests.  Incensed by the government's actions, Ahodikpe joined the Democratic Convention of African Peoples under Dr. Leopold Gnininvi, which organized protests and campaigns against then-President Gnassingbe Eyadema.  As political tension mounted, Ahodikpe fled to neighboring Ghana but returned at the age of sixteen "after things calmed down a little with elections in June of 1994."

Ahodikpe recounts three instances of politically motivated mistreatment following his return to Togo.  First, during his senior year in high school, Ahodikpe was out one night buying bread when a group of soldiers stopped him and demanded identification.  Upon learning Ahodikpe's name, one soldier surmised (incorrectly) that his ethnicity is Ewe, a group associated with opposition politics in southern Togo.  The soldier smacked Ahodikpe and bruised his face before finally permitting him to return home.  Later Ahodikpe and his parents discussed whether to report the incident to the police but decided not to do so for fear of reprisal.

On another occasion that same school year, a soldier ordered Ahodikpe to stop as he walked past a military checkpoint.  Ahodikpe assumed that the soldier was addressing someone else, however, and continued walking.  This infuriated the soldier, who rushed at Ahodikpe and beat him with a belt.  Ahodikpe begged for mercy and mentioned that his father was a government-employed harbor pilot nearby.  The soldier's response made Ahodikpe cringe: "[H]e said that they knew who my father was.  That they knew he was from the south and we did not support the president.  His days were numbered as a pilot over there in the harbor."  Again, Ahodikpe decided not to report the incident.

One year later Ahodikpe decided to flee Togo and pursue his education elsewhere.  But when he applied for a Togolese passport in June 1999, a soldier at the passport office recognized him from a student protest earlier that day and pulled him out of line.  Ahodikpe denied any participation (although he had been present at the protest); nevertheless, a group of soldiers dragged Ahodikpe downstairs to a storage room, where they beat him and demanded the names of other student protesters.  Unfortunately, the record provides little detail about this episode.  Ahodikpe testified that he was "shortly detained," although his detention lasted until "late at night."  Ahodikpe, moreover, did not supply any information about the severity of the physical abuse that he suffered or whether he needed medical

treatment following the incident. The record reflects only that, in Ahodikpe's words, he "was brutalized," "beaten continuously," or, alternately, "spanked." Ahodikpe was finally released later that evening when his uncle came to the office and assured the soldiers that his nephew had not attended the protest.

Ahodikpe eventually received a passport and a student visa, which he used to travel to the United States in 1999. While Ahodikpe attended classes at Saint Peter's College in Jersey City, New Jersey, his family remained in Togo. Shortly after Ahodikpe's departure, his father was fired for not supporting the government and for sending Ahodikpe overseas. Later, in approximately 2002, armed soldiers forcibly evicted Ahodikpe's family from their "government condos." Finally, in 2003, soldiers beat Ahodikpe's family for their support of government-opposition groups.

In February 2005 President Gnassingbe Eyadema died unexpectedly, leaving Togo in chaos. As a violent power struggle ensued, approximately 40,000 Togolese citizens fled the country. Two months later Togo elected Eyadema's son Faure to replace his father, although many believed that the election was rigged. The violence continued until 2006, when Togo's political parties banded together to form a transitional coalition government. Judging from the record, Togo remains volatile, although the country is less dangerous now than three years ago; and those who opposed Gnassingbe and Faure Eyadema finally have a voice in government.

Ahodikpe stayed in the United States long after his student visa expired in 2003. And when he finally received a notice to appear, Ahodikpe conceded removability and sought asylum, withholding of removal, and protection under the CAT.

Following an evidentiary hearing, the IJ rejected Ahodikpe's argument that a change in country conditions—Gnassingbe Eyadema's refusal to step down from the presidency in 2004 as promised—excused Ahodikpe's failure to apply for asylum within a year of his arrival in the United States. Accordingly, the IJ determined that Ahodikpe's asylum application was untimely. Next, the IJ concluded that Ahodikpe had not established past persecution. According to the IJ, Ahodikpe's various encounters with Togolese soldiers were brief and the resulting harm was not great; Ahodikpe suffered only bruises and never sought medical treatment. Nor did Ahodikpe establish a clear probability of being tortured—or even persecuted—upon return.

The BIA adopted the IJ's decision and supplemented the IJ's reasoning in a separate opinion. The BIA agreed that Ahodikpe's asylum application arrived too late and that no change in country conditions excused the tardiness. As for the remaining applications, the BIA wrote, "We agree with the Immigration Judge that the three brief encounters the

respondent had with the military, during which he was physically mistreated, even when considered in the aggregate, constituted mere harassment and did not rise to the level of persecution."

**Analysis**

Ahodikpe pursues two arguments before this court. First, he asserts that, contrary to the IJ's findings, his mistreatment amounted to persecution. Second, he contends that the IJ did not devote adequate attention to his CAT claim. Where, as here, the BIA adopts and supplements the decision of the IJ, we will review the two opinions in combination. *See Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007); *Tchemkou v. Gonzales*, 495 F.3d 785, 790 (7th Cir. 2007). Our task is to determine whether substantial evidence supports the decision to deny Ahodikpe's applications. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1087 (7th Cir. 2006).

A petitioner seeking withholding of removal must demonstrate a clear probability ("more likely than not") of future persecution on account of his race, religion, nationality, membership in a social group, or political opinion. *See* 8 U.S.C. § 1231(b)(3)(A); *Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007). If that individual can show past persecution, as Ahodikpe attempted to do here, he is entitled to a rebuttable presumption of future persecution. *See Irasoc v. Mukasey*, 522 F.3d 727, 729-30 (7th Cir. 2008).

Ahodikpe concedes that the two earliest incidents were "brief encounter[s]" outside of the scope of persecution. He argues that the third incident amounted to persecution, and he emphasizes the severity and duration of his detention at the passport office. He notes for the court that he was beaten in a hidden room and held until nightfall. Yet that episode still falls short of persecution without more information about the incident. This court defines persecution as punishment or the infliction of harm administered on account of a protected ground. *Irasoc*, 522 F.3d at 730; *see Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2004). Mere harassment is insufficient to establish persecution; a petitioner alleging persecution in the form of physical abuse must be able to point to significant harm. *See Tarraf v. Gonzales*, 495 F.3d 525, 535 (7th Cir. 2007); *Tesfu v. Ashcroft*, 322 F.3d 477, 481 (7th Cir. 2003). And while "[c]onduct can rise to the level of persecution without being life-threatening," we consider the frequency and severity of the harm alleged when reviewing a determination that the petitioner did not suffer persecution. *Tarraf*, 495 F.3d at 535; *see Irasoc*, 522 F.3d at 730. Even a single incident can amount to persecution provided the harm inflicted is grievous. *See Irasoc*, 522 F.3d at 730.

Ahodikpe cannot prevail on this record. Nowhere does he mention any injury from that day, nor does he discuss the severity of his mistreatment, and the obvious inference is that he did not seek medical help. Instead he argues that several hours of detention coupled

with *some* physical abuse is enough. But he neglects to provide any legal authority to support that particular contention. And our case law does not jibe with Ahodikpe's proposition. A single episode of detention and unspecified physical abuse, lasting for less than 24 hours, does not perforce constitute persecution. *See, e.g., Mema v. Gonzales*, 474 F.3d 412, 417-18 (7th Cir. 2007) (holding that evidence of kidnapping at gunpoint, interrogation, and beating did not compel finding of persecution); *Zhu v. Gonzales*, 465 F.3d 316, 319-21 (7th Cir. 2006) (holding that evidence of isolated incident in which government officials beat petitioner and struck him with a brick, resulting in seven stitches, did not compel finding of persecution); *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (holding that evidence of multiple interrogations and 24-hour detention did not compel finding of persecution). Thus, without more information, Ahodikpe's contention that he suffered past persecution must fail.

Ahodikpe also complains that he did not receive adequate consideration of his CAT claim. A petitioner seeking relief under the CAT must establish that it is more likely than not that he will be tortured upon removal. 8 C.F.R. § 208.18(a)(1); *Ogayonne v. Mukasey*, 530 F.3d 514, 522 (7th Cir. 2008). When reviewing an application for relief under the CAT, an IJ must consider evidence of past torture, evidence that the applicant could relocate safely upon removal, evidence of gross, flagrant, or mass violations of human rights, and any other relevant country conditions. *See Tchemkou*, 495 F.3d at 795 (citing 8 C.F.R. § 208.16(c)(3)(i)-(iv)).

Although Ahodikpe does not contend that he was tortured, he argues that he was entitled to relief under the CAT on the basis of evidence of gross, flagrant, or mass violations of human rights in Togo. According to Ahodikpe, the IJ's terse denial of his CAT application demonstrates a refusal to consider Ahodikpe's evidence of widespread human-rights violations. The record suggests otherwise. At the conclusion of the hearing, the IJ drew observations about conditions in Togo from a BBC News timeline, the 2005 U.S. Department of State Country Report on Human Rights Practices, and various reports from the U.N. Office for the Coordination of Humanitarian Affairs. The IJ observed that in 2005, following President Eyadema's death, "human rights conditions deteriorated significantly." Still, the IJ continued, the new government "has shown a willingness to improve the country's human rights record," and half of the refugees that fled the country because of recent political turmoil had since returned. In response, Ahodikpe points us to a report entitled "Togo: Refugees beginning returning home but many still reluctant." Yet that article, too, describes a nation that is recovering, however slowly, from violence and political upheaval. Ahodikpe makes passing reference to other human-rights reports and photos taken in 2005 of the victims of political violence, but his argument that "Togo is not a better country today" is contrary to current reports the IJ considered. Given those reports, the IJ obviously did not blind himself to Togo's human-rights situation. Ahodikpe's petition is denied.